

✓ FILED        ___ LODGED
___ RECEIVED   ___ COPY

MAY 0 3 2022

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

1  **John H. Thaler, In Pro Se**
   c/o HARRIS/THALER LAW
2  7226 E. Cortez Road
   Scottsdale, Arizona 85260
3  Tel. 818-219-0807
   jhtlaw@msn.com
4

5

6

7

8                    **FEDERAL DISTRICT COURT**

9                    **STATE OF ARIZONA**

10

11 **JOHN H. THALER, an individual,**      **CASE NO.**  **CV22-00749-PHX-JAT--JZB**

12                **Plaintiff,**            **COMPLAINT FOR DAMAGES AND
                                            FOR INJUNCTIVE RELIEF:**
13                   **v.**

14                                          **1. VIOLATIONS OF 42 U.S.C. §1983**

15 **BRITTANY RAE CHAVEZ aka
   BRITTANY RAE THALER, an individual,**   **2. VIOLATIONS OF 42 U.S.C. §1997**
16 **DAWNA RAE CHAVEZ, an individual,
   LAWRENCE CAIRO, an individual, CITY**   **3. CONSPIRACY TO VIOLATE 18
17 **OF MESA, a chartered city in the County**  **U.S.C. §241**
   **of Maricopa, State of Arizona, JOHN P.**
18 **TATZ, individually and as presiding judge,**  **4. CONSPIRACY TO VIOLATE 18
   **Mesa City Court, ALICIA LAWLER,**     **U.S.C. §242**
19 **individually, and as judge, Mesa City**
   **Court, RYAN WIMMER, individually and**  **5. VIOLATION OF 42 U.S.C. §14141**
20 **as Treasurer, City of Mesa, , JOSEPH**
   **LISITANO, CPA, individually and as**   **6. VIOLATIONS OF SUBSTANTIVE
21 **Auditor of the City Auditor, JOHN GILES**  **DUE PROCESS**
   **individually and as Mayor of the City of**
22 **Mesa, FRANCISCO HEREDIA,**            **7. VIOLATIONS OF PROCEDURAL
   **individually and as City Auditor, City of**  **DUE PROCESS**
23 **Mesa, MARK FREEMAN, individually and**
   **as Council Member, City of Mesa City**  **8. VIOLATION OF EQUAL
24 **Council, JENN DUFF, individually and as**  **PROTECTION**
   **Council Member, City of Mesa City**
25 **Council, DAVID LUNA, individually and**  **9. CONVERSION**
   **as Council Member, City of Mesa City**
26 **Council KEVIN THOMPSON, individually**  **10. CONSPIRACY TO DEFRAUD;**

27

28

and as Council Member, City of Mesa City Council,  JAMES SMITH, individually and as Mesa City Attorney, PAUL HAWKINS, individually and as City Prosecutor, City of Mesa, BARBARA KIFFMEYER, an individual, GREG DAVIS, an individual, ERICA GADBERRY, an individual, JACOB G. ROESSLER, individually and as a police officer, City of Mesa, BRIAN BULLOCK, individually and as a police officer, Town of Gilbert, TOWN OF GILBERT, a chartered city in the County of Maricopa, MARK LAMMERS, an individual, CHRISTOPHER FELBO, an individual, NICOLETTA FELBO, an individual COUNTY OF MARICOPA, ARIZONA DIVISION OF CHILD SUPPORT SERVICES and DOES 1 through 150, inclusive,

**Defendants.**

11.  **INVASION OF PRIVACY;**

12.  **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;**

13.  **INTERFERENCE WITH BUSINESS;**

14. **INJUNCTIVE RELIEF.**

15. **DECLARATORY RELIEF/INJUNCTIVE RELIEF;**

16.  **DECLARATORY RELIEF/INJUNCTIVE RELIEF;**

17. **QUIET TITLE;**

18. **ACCOUNTING.**

COMES NOW PLAINTIFF WHO ALLEGES THE FOLLOWING:

**Parties**

1.    At all relevant times mentioned herein, Plaintiff John Harris Thaler was and is a resident of the State of Arizona and a resident of the State of Nevada with a law practice based in the State of California.

2.    At all relevant times mentioned herein, Defendant Brittany Chavez a.k.a. Brittany Rae Chavez a.k.a. Brittany Thaler, who is also known as Brittany Phillips a.k.a. Brittany Harris a.k.a. Brittany Miller a.k.a. Bianca Chavez a.k.a. Brittany Johnson aka Brittany Leonard and other

aliases ("Brittany") was and is a resident of the County of Maricopa, City of Mesa, Arizona. Brittany currently remains the spouse of Plaintiff. A complaint for annulment is pending in Clark County, Nevada.

3.      At all relevant times mentioned herein, Defendant Dawna Chavez, who is also known as Donna Chavez, aka Dawna Marie Chavez, aka Dawna M. Chavez a.k.a. Dawn Chavez a.k.a. Daniel Chavez ("Dawna") was and is a resident of the County of Maricopa, City of Mesa, Arizona.

4.      At all relevant times mentioned herein, City of Mesa is a city Incorporated within the State of Arizona.

5.      At all relevant times mentioned herein, Defendant John P. Tatz was and is an individual residing in Maricopa County and was and is the presiding judge, City of Mesa Court.

6.      At all relevant times mentioned herein, Alicia Lawler was and is an individual residing in Maricopa County and was and is a judge of the City of Mesa Court.

7.      At all relevant times mentioned herein, John Giles was and is an individual residing in Maricopa County and was and is the Mayor of the City of Mesa.

8.      At all relevant times mentioned herein, Ryan Wimmer was and is an individual residing in Maricopa County and was and is the treasurer of the City of Mesa.

9.      At all relevant times mentioned herein, Joseph Lisitano was and is an individual residing in Maricopa County and was and is the auditor of the City of Mesa.

10.     At all relevant times mentioned herein, Paul Hawkins was and is an individual residing in Maricopa County and was and is the City Prosecutor of the City of Mesa

11.     At all relevant times mentioned herein, James Smith was and is an individual residing in Maricopa County and was and is the City Attorney of the City of Mesa

12.     At all relevant times mentioned herein, Francisco Heredia was and is an individual residing in Maricopa County and was and is the City Auditor of the City of Mesa.

13.     At all relevant times mentioned herein, Mark Freeman was and is an individual residing in Maricopa County and was and is the City Auditor of the City of Mesa.

14.    At all relevant times mentioned herein, Jenn Duff was and is an individual residing in Maricopa County and was and is a council member of the City of Mesa.

15.    At all relevant times mentioned herein, David Luna was and is an individual residing in Maricopa County and was and is a council member of the City of Mesa.

16.    At all relevant times mentioned herein, Kevin Thompson was and is an individual residing in Maricopa County and was and is a council member of the City of Mesa.

17.    At all relevant times mentioned herein, Defendant Jacob G. Roessler was and is a resident of Maricopa County, Arizona and is employed as a police officer with the City of Mesa Police Department.

18.    At all relevant times mentioned herein, Defendant Brian Bullock, was and is a resident of Maricopa County, Arizona and is a police officer with the Town of Gilbert.

19.    At all relevant times mentioned herein, Defendant Lawrence Cairo was and is a resident of the County of Maricopa, City of Mesa, Arizona.

20.    At all relevant times mentioned herein, Defendant Christopher Falbo was and is a resident of the County of Maricopa, City of Gilbert, Arizona.

21.    At all relevant times mentioned herein, Defendant Nicoletta Falbo was and is a resident of the County of Maricopa, City of Gilbert, Arizona.

22.    At all relevant times mentioned herein, Defendant Gregory R. Davis was and is a resident of the City of Gilbert, Maricopa County, Arizona and is an attorney licensed in the State of Arizona.

23.    At all relevant times mentioned herein, Defendant Erica Gadberry was and is a resident of Maricopa County, Arizona and is an attorney licensed in the State of Arizona.

24.    At all relevant times mentioned herein, Maricopa County is a recognized county in the State of Arizona.

25.    At all relevant times mentioned herein, Barbara Kiffmeyer is a licensed social worker (LMSW) operating as a Court Appointed Advisor for the County of Maricopa Superior Court system.

26.   At all relevant times mentioned herein, the Arizona Division of Child Support Services was and is an agency operating under charter from State of Arizona.

27.   At all relevant times mentioned herein, DOES 1 through 1500 are residents of the State of Arizona and employees of the State of Arizona whom Plaintiff is not able at this time to identify by name. At such time that Plaintiff is able to make such an identification, he shall seek leave to amend this Complaint.

28.   At all relevant times mentioned herein, Defendants and each of them acted in concert and conspiracy so that the acts of each Defendant were on behalf of all Defendants.  Thus, each Defendant is liable for the acts of the others.

29.   Hereinafter, the following defendants, John P. Tatz, Alicia Lawler, Ryan Wimmer, Joseph Lisitano, John Giles, Francisco Heredia, Mark Freeman, Jenn Duff,  David Luna, Kevin Thompson, Paul Hawkins, Jacob G. Roessler, shall be commonly known as the "Mesa defendants."

30.   This Complaint concerns racketeering enterprises operated by City of Mesa public and appointed officials. The discovery of the same by Plaintiff, and actions of defendants herein to cover up the corruption.  Said cover up has included the abduction of McKinley Harris Thaler, the now four-year old son of Plaintiff and Brittany.  Plaintiff has not seen nor has had any contact with McKinley since September 2020 as a result of the following:

**Summary of the Facts:**

31.   Plaintiff is an attorney with more than thirty-one (31) years of investigating racketeering crimes.

32.   Beginning in or about May 2018 and continuing to the present, Plaintiff uncovered racketeering enterprises involving numerous public officials especially officials in the City of Mesa.  Said officials include the Mayor, the City Treasurer, the City Auditor, The City Prosecutor, multiple City Council members, police officers and judges.

33.   Plaintiff also uncovered evidence of racketeering among officials in the City of Chandler, the City of Phoenix and the Town of Gilbert.

34.     Further, Plaintiff discovered that Brittany, Dawna and members of the Chavez family were participants in the activities, specifically they were and are the creators of phony and forged recorded and legal documents necessary to effect the enterprises.

35.     Brittany planned to meet, met, dated and married Plaintiff with the intent of removing herself from participating in the criminal enterprises and then hiding behind him for protection—all unbeknownst to Plaintiff.

36.     Beginning in late 2018, as Plaintiff slowly discovered his wife and her family's participation in the enterprises, the Mesa defendants and Dawna pressured Brittany into terminating her marriage with Plaintiff.  She refused.

37.     In April 2019, said Defendants conspired to kill Plaintiff.  That attempt failed.  They then made a second attempt on July 7, 2019 and a third attempt in late October 2019.  Then in November 2019, when the Mesa defendants feared Brittany was about to seek WITSEC protection, they devised a new scheme to violate Plaintiff's civil rights as follows: said defendants would coerce Brittany and Dawna into creating phony Orders of Protection; Brittany and Dawna would then abduct McKinley in violation of the Family court's February 20, 2020 Custody Order thus inducing Plaintiff to confront Brittany and Dawna and thus violating the phony restraining orders.  The presumed violations would result in charges.  Said charges would be assigned to Defendant Lawler who would ensure convictions and ultimately incarceration.

38.     As this scheme failed, defendants resorted to inventing violations of the restraining orders, including the manufacturing of evidence thereon, in order to harm Plaintiff financially, emotionally, and physically by charging him with said violations, with assignment to Defendant Lawler's courtroom, and thereafter convicting him in absentia with the intent of incarcerating him.

39.     The Mesa defendants also took illegal actions to recover documents and evidence linking them to the racketeering enterprises that they feared Brittany had provided.  Said actions included breaking into Plaintiff's residence in Gilbert, Arizona on October 18, 2020 and into his Las Vegas, Nevada residence on December 26, 2021.

40.     Plaintiff has been damaged in multiple ways by the actions of all of these defendants for which he seeks monetary damages and injunctive relief to stop their illegal actions which violate his federal Constitutional rights.

## Subject Matter Jurisdiction

41.     This action concerns damages suffered by Plaintiff and his law office, including damages resulting from the violations of his civil rights by the within Defendants either because of their participation in the criminal enterprises or their attempts to cover up the enterprises or their attempts to cover up their participation.  By their conduct, Defendants conspired to violate and/or violated Plaintiff's rights under the following statutes:

    a.   Violations of 42 U.S.C. §1983 by individuals, government employees and agencies engaging in racketeering activities and in actions to cover up the same as described in detail hereinbelow.

    b.   Violations of Equal Protection and Substantive and Procedural Due Process Rights as set forth in the Fifth Amendment of the U.S. Constitution and applicable to the States through the Fourteenth Amendment of the U.S. Constitution by state and local governments and their agencies.

    c.   Violations of 18 U.S.C. §241 relating to actions by multiple parties to violate civil rights through injury, oppression, threat or intimidation.

    d.   Violations of 18 U.S.C. §242 relating to actions by employees of state and local government agencies to deprive an individual of their rights under the color of law.

    e.   Violations of 18 U.S.C. §14141 by state and local government agencies engaging in certain practices that have resulted in violating Plaintiff's civil rights and the rights of others similarly situated.

    f.   Violations of the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) by the City of Mesa leading to the use and abuse of McKinley Harris Thaler, the four-year-old son of Plaintiff and Brittany.  Said abuse includes the abduction of McKinley by Defendants, Dawna (Brittany's mother) and Lawrence Cairo (mother's boyfriend),

with the aid of the other named Defendants and having Brittany stage a contrived custody battle with perjured testimony and falsified evidence to accomplish the following: a) extort Plaintiff into halting his investigating and/or reporting Defendants' activities to appropriate law enforcement; b) divert Plaintiff's attention from the criminal enterprises; c) damage Plaintiff's reputation with false abuse claims against his child and Brittany so as to damage his credibility; d) drain Plaintiff's financial resources through said custody battle and through phony support orders.

g. Further, it concerns a series of criminal multi-state racketeering enterprises (described in greater detail hereinbelow) existing for more than fifteen (15) years, and Defendants' participation in some or all of them at all times or various relevant times described herein. In addition to said named Defendants, the enterprises concern the participation of numerous employees of state and local government agencies including law enforcement agencies, court personnel and judges.

42. Additionally, this matter concerns:

a. Actions of the Court-Appointed Advisor re: custody, Barbara Kiffmeyer, and Attorney Greg R. Davis wherein Kiffmeyer agreed to falsify her "Court Appointed Advisor" reports in favor of Davis' clients in exchange for payment and other considerations. Plaintiff is informed and believes that Defendants Greg R. Davis and Barbara Kiffmeyer have been working in concert to falsify reports on behalf of Davis' clients for years, Plaintiff being just the latest victim.

b. The corrupt activities of multiple judges who have accepted bribes including John P. Tatz, Presiding Judge, City of Mesa, and Alicia Lawler, Judge, City of Mesa, in permitting participants in the scheme to use their authority to create fake orders in their names and to act in such a manner as to prevent Plaintiff from safely residing in Arizona or pursuing this and other legal remedies.

c.  Extortion by means of fraudulent and fake default judgments, including an extortion attempt against Plaintiff that began in 2012 through a phony California judgment brought to Maricopa County and entered as a foreign state judgment.

43.   Said acts confer jurisdiction under the following statutes: 42 U.S.C. §1983 (violations of federal civil rights by government agencies), 42 U.S.C. §1997 (unlawful for state or local enforcement agencies to allow officers to engage in a pattern or practice of conduct the deprived persons rights); 18 U.S.C. §241 and §242 (deprivation of rights under color of law by willfully depriving or causing or to have caused to be deprived from any person rights, their privileges or immunities protected by the Constitution); 18 U.S.C. §14141 (unlawful for any government authority or agent or person acting on behalf of the government authority engage in a pattern or practice of conduct that's a price versus rights privileges or immunities secured or protected by the Constitution).

44.   Also, this Court has jurisdiction to adjudicate issues concerning the actions described herein below as they constitute racketeering defined in 18 U.S.C. §1961 (murder, kidnapping, robbery, bribery, extortion, or dealing in a controlled substance or listed chemical) and defined in: 18 U.S.C. §201 (relating to bribery), §224, §659 (relating to theft from interstate shipment), §664 (relating to embezzlement from pension and welfare funds), §891–894 (relating to extortionate credit transactions), §1028 (relating to fraud and related activity in connection with identification documents), §1341 (relating to mail fraud), §1343 (relating to wire fraud), §1344 (relating to financial institution fraud), §1503 (relating to obstruction of justice), §1510 (relating to obstruction of criminal investigations), §1511 (relating to the obstruction of state or local law enforcement), §1512 (relating to tampering with a witness, victim, or an informant), §1513 (relating to retaliating against a witness, victim, or an informant), slavery, and trafficking in persons, §1831 and §1832, §1951 (relating to interference with commerce, robbery, or extortion), §1952 (relating to racketeering), §1956 (relating to the laundering of monetary instruments), §1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), §1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire),  any

offense involving fraud connected with a case under title 11 including importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in §102 of the Controlled Substances Act), punishable under any law of the United States.

## In Personam Jurisdiction

45.    With respect to personal jurisdiction, the racketeering enterprises are active in multiple states, but are most prevalent in Arizona. The actions, led by the Mesa defendants that resulted in Plaintiff's damages mostly occurred in Arizona and in California. The Defendants live or exist in Arizona.

## Venue

46.    Pursuant to 28 U.S.C. §1391, venue is appropriate in the Arizona Federal District Court in Phoenix as Plaintiff's damages occurred mostly in the State of Arizona and in this district..

## No Judicial and Public Employee Immunity

47.    A judge is not immune from liability for non-judicial actions. Mireles v. Waco, 509 U.S. 9, 11-12 (1991). An act is "judicial" if the nature of the act constitutes a function normally performed by the judge in his adjudicative capacity. Stump v. Sparkman, 435 U.S. 349, 362 (1978). Further, a judge is not immune from liability for judicial actions taken in absence of all jurisdiction. Stump at 356-57.

48.    With respect to the Mesa City court judges named herein, none are immune from civil litigation as they acted outside of their adjudicative capacity, they acted in the absence of all jurisdiction and they acted in their own self-interest in furtherance of criminal conduct. To wit: Defendants Tatz and Lawler accepted payment from third parties to act in the interests of those third parties and in violation of the rights of those who came before their court or the citizens of the State of Arizona. And specifically, they acted to violate Plaintiff's civil rights in exchange for payment received from third parties.

49.    As to the other public officials and quasi-public officials named as Defendants herein, they also received bribes to act in furtherance of the conspiracy to defraud individual and to deprive individuals, including Plaintiff, of their civil rights.

50.     Further, all of the defendants named herein acted in conspiracy to deprive McKinley Harris Thaler of his civil rights.

51.     As a result, immunity does not apply.

## GENERAL ALLEGATIONS

### The Criminal Enterprises

52.     Plaintiff suffered damages as a direct and proximate result of discovering that his spouse and her family have been long standing participants in multiple racketeering enterprises operating in at least 19 states and for discovering that City of Mesa officials have used their positions of authority to receive bribes and other compensation for their own benefit and to deprive others of their civil rights.

53.     All named Defendants herein are participants in some or all of the criminal racketeering enterprises set forth in detail infra.  Further, Defendant Brittany Rae Chavez and her mother, Dawna Rae Chavez, also are facilitators of certain enterprises including bribes paid to the within defendants and to other public elected and appointed officials.

### The Schemes:

   A.  Money Laundering/Tax Evasion Schemes

54.     At the heart of the enterprises is money laundering and tax evasion through phony sales of real property, generally single-family residences in new construction developments, mostly in Arizona, California, New Mexico, Texas and Colorado.  These schemes are used by the participants of the criminal enterprises listed hereinbelow and by family and friends of Brittany and Dawna.  In a vast majority of the laundering through real property sales, either Dawna or Brittany serves as the "notary" under a phony name and notary stamp.  The number of phony notarizations over the past 15 years discovered to date exceeds 15,000 with well over 2,500 in Arizona.

55.     The money laundering is also accomplished through non-profit organizations including schools and section 501(c)(4) companies such as mutual benefit organizations. Some of these companies operate in a legitimate environment, but place students on the rolls who do not exist.

The school is then "paid" tuition dollars which in fact are illegally earned monies being laundered. By example, the Conservatory for Recording Arts & Sciences in Gilbert, Arizona has phony students on its rolls.

56.     Other non-profit and for-profit schools exist only on paper. The attendance rolls are inflated with monies laundered through phony tuition payments.

57.     The money laundering is also accomplished through overinflated construction charges often for non-existent "projects."

58.     The monies to be laundered comes from illegal drug/narcotics sales, human smuggling operations, contraband smuggling (such as stolen art) and various legal and illegal business operations which have included securities fraud.

   B.  Payroll Theft

59.     Using a software systems flaw, hackers create a phantom individual who is then uploaded into the human resource database of a large public or private employer. The phantom employee receives a paycheck which is direct deposited into a Wells Fargo bank account. Thereafter, portions of the money are shifted to other banks' accounts.  Other portions are withdrawn and laundered through the above enterprises.

60.     Brittany has participated in at least 5,000 thefts over the past ten (10) years by preparing the documents, including fake employment applications, to be uploaded into companies' HR databases. Said applications et al. further defraud the victim into believing that the employee exists.

   C.  Bankruptcy Fraud

61.     Once the phantom employee receives a paycheck, a credit reporting agency involved in the scheme ensures the "employee" has a credit score of more than 700. Thereafter, unsecured credit is obtained and maxed out. The "employee" then files for bankruptcy protection to wipe out the debt.

62.     Brittany has prepared and filed more than 3,000 fraudulent bankruptcies, mostly Chapter 7 cases over the past ten years in at least eleven separate states in the names of the phantom employees.  By example, names include: Brittany Rae Swanson, Brittany Rae Ponder, Brittany Rae Perry, Brittany Miller, Melinda Ann Miller, Brittany Nicole Scott, Brittany Rae Behanna, Dawn

Chavez, Brittany Nicole Artis, Brittany Nicole Masden, Brittany LaPointe, Brittany Nicole Vandusen, Brittany Speaker, Brittany V. Crenshaw, Brittany Virginia Sanders, Brittany Virginia Chavez and so on. Many of these names are used more than once, sometimes in the same state but different district, sometimes in multiple states. States most commonly filed in: California, Colorado, Ohio, Michigan, Florida and Georgia.

63.     By example: one phony bankruptcy concerns Brittany as "Brittany Virginia. Chavez" and Ricky Glenn Goodwin, Jr where a Chapter 7 filing was made on or about November 2, 2018, Case No. 2:2018-bk-13500 (azb), with 341a hearing heard at 10:00 a.m. on December 13, 2018. (Goodwin died in 2016.)  For reasons set forth hereafter, Brittany was forced by Dawna not to attend the hearing and to let the filing be dismissed.  Defying her mother, shortly after she missed the hearing, Brittany sent a note to the trustee falsely stating that she did not appear due to a flat tire and asking for the hearing to be rescheduled.  When the trustee and Court heard nothing further, the bankruptcy petition was dismissed.

   D.  Life Insurance Fraud

64.     A number of the phantom employees sign on for group life insurance benefits in an amount between five and nine times annual salary. When cash is needed, the phantom employee "dies".  A phantom husband listed on the insurance application files a benefits claim.

65.     Such was the case of "Brittany Virginia Chavez" (noted above) in Phoenix, Arizona.  This phantom individual was "employed" at Dignity Health in Phoenix.  At the alleged start of employment in 2015, she requested 1x annual salary in life insurance benefits.  In 2017, she requested 3x salary and in 2018, she requested 5x salary—the maximum available.  As stated above, a bankruptcy petition was filed in November 2018 to discharge all debt.  The plan was to "kill off" Brittany Virginia Chavez in Spring 2019 shortly after the discharge in order for Brittany and Dawna to pay accumulated debts associated with the criminal enterprises.

66.     Such was also the case of "Debra Gatti," allegedly a school teacher in Arlington, Washington.  The phantom Ms. Gatti was the "wife" of the alleged managing partner of RH Partners Ownerco, Joseph Vernon Gatti.

67.     RH Partners Ownerco owns the property where Brittany Virginia Chavez allegedly once resided. "Ms. Gatti" selected 9x annual benefits through the State of Washington and the group life insurance provider, MetLife. On April 15, 2020, Ms. Gatti died.

68.     Documents obtained from MetLife evidence Brittany acting as Debra Gatti and Brittany and Dawna filing death benefits claims with MetLife for the policy amount of $375,000.

69.     It was from the $375,000 that the defendant public officials named herein received bribes specifically to damage Plaintiff through violations of his civil rights.

E. <u>Auto and Home Insurance Fraud</u>

70.     The insurance fraud concerns payment to non-existent parties for personal injury claims made under Med Pay provisions of homeowners' policies and automobile policies. The Med Pay provisions in these policies concern clauses that include no-fault payment of up to $5,000 for medical treatment for an individual.

71.     Simply put, if an individual visits another's home and slips and falls in that home, his medical treatment up to $5,000 could be paid by the Med Pay provision without fault and without any increase in premium to the homeowner.

72.     Said fraud has netted more than $50 million in the past 15 years. It relies on phony medical bills plus the recording of the treatment lien. A coded bill with a copy of the lien is then sent to the insurance company who then provides a check, believing that the check is being sent to the medical provider. However, the liens are all fraudulent and fake and are signed and executed by Dawna Chavez using an assumed name and by either Dawna Chavez or by Brittany Chavez as a fake notary under an assumed name.

F. <u>Narcotics Trafficking and Sales</u>

73.     Prescription and designer narcotics are moved from Mexico through Calexico to Brawley to Salton City to Twenty-Nine Palms to Bullhead City, Arizona, to Kingman, Arizona, to Flagstaff, to Phoenix, to Casa Grande, and then to Tucson, Arizona. Brittany facilitates the cash flow and laundering of sale proceeds.

74.    Brittany and Dawna also facilitate cash flow and distribution for drugs shipped from Florida.

75.    The houses are purchased with laundered money and are constructed or modified with drop boxes set forth in the walls of the residence. These drop boxes are hidden and are nearly impossible to find. To give the appearance of legitimacy, these houses are put through phony sales transactions possibly every two to three years. The drop boxes are routinely serviced with portions of the cash being returned to the drug suppliers, portions becoming capital contributions for the setup of the limited liability companies in subsequent schemes, and portions becoming investment capital for seemingly legitimate investments.

76.    An example of a drop box house includes the 6211 W. Indianola Avenue address. Another example is 1113 E. Diamond Street, Phoenix, Arizona 85006, a stash house located in South Central Phoenix where drugs are kept prior to local distribution.

77.    Additionally, Brittany set up a computer server and router scheme using pornography as a cover for the transfer of money. One such site is under the URL "bigbootyhoes420.com." The site contains short pornographic videos. To launder money, said videos were/are made available for sale through debit card transactions from accounts holding illegally obtained money, mostly from the sale of drugs. Through the "purchases" of these videos, said money is laundered and made clean.

    G.  Public Corruption: Creating and/or Modifying Public Records

78.    In effecting the schemes set forth above, Defendants created or obtained access to databases for multiple cities, counties and states. That includes the Arizona State database, the Maricopa County database and the City of Mesa database. By doing so, Defendants were/are able to insert backdated records, remove records and modify existing records to meet their needs. These records include the typical documents recorded with the Maricopa County Recorder, court records, arrest records, and collection records concerning State Programs including the family support program.

79.    Specifically, in the matter of court records, Brittany and Dawna and the Defendants herein have participated in extortion of individuals who might prove harmful to the continuing of their

enterprises by creating false arrests or created and invented charges and fraudulent civil judgments. With respect to Plaintiff, they have attempted to do both.

H.  Public Corruption: Bribing Public Officials

80.   To effect and to protect the racketeering enterprises, bribes are paid to private individuals usually before they accept a position of public employment.  This includes judges, police officers, state police officers, judicial assistants, inspectors, assessors, and accountants.  It includes several of the Defendants named herein.

I.  Corruption: Private Parties

81.   In addition to public officials, monies are used to bribe licensed officials such as real estate agents, real estate brokers, and Court approved "experts."

82.   These enterprises existed long before Plaintiff and Brittany met, continued through their relationship, and have continued to date.

J.  Extortion by Computer Virus

83.   Defendants conspired with other accomplices to create crypto-viruses and infect the computer systems of businesses and thereafter providing the encrypting code only after a ransom was paid.

K.  Creating Licensed Individuals including Attorneys

84.   To operate the various racketeering schemes, Defendants created fake state and local government employees in California and in Arizona.  They also created fake "individuals" licensed through state agencies.  For example, in California, "Arlene Chavez" was created as a real estate agent with an office allegedly located in La Mirada.  "Paul Tokeshi" was created as a fake attorney with an office in Santa Anita, California. His profile and "history" was uploaded into the State Bar computer to give the appearance of existence.

85.   In Arizona, several attorneys were created and placed into the State Bar database including "Brittany Chavez."  Moreover, almost every "Brittany Chavez" listed as residing in the State of Arizona other than Defendant Brittany is a fake individual.

86.     Plaintiff is informed and believes and thereon alleges that in addition to fake individuals presumptively operating under legitimate licenses, each State has real individuals operating under licenses that were never properly licensed through the state or local government agency or who failed to pass examinations or otherwise meet the requirements necessary for licensure.

**The City of Mesa Schemes**:

87.     The City of Mesa is essentially run and operated by individuals tied to the Mormon Temple. For at least the past thirty years, the Mormon community has had significant financial interests in Mexico. Beginning in the early 1990's, as Mexican drug cartel violence grew, Mormon groups entered into arrangements with the drug cartels wherein Mormons entering into Mexico would receive protection and would have their financial interests protected in exchange for protection from prosecution for drug related crimes and money laundering.

88.     One such arrangement was made with public officials and private citizens in the City of Mesa. As a result, since at least the mid 1990's, Mexican drug cartels, especially the Sinaloa Cartel, have used resourced within the City of Mesa to launder monies received from drug/narcotics sales through systems as set forth above. Brittany, Dawna, and members of the Chavez family facilitate the laundering processes under the protection of the Mesa defendants.

89.     Further, the Mesa Defendants take actions in their official capacities to protect the cartels' operations by using the city's police department and judicial system to harass those who intentionally or inadvertently interfere in the illegal operations. The harassment includes falsifying charges against innocent individuals leading to steep fines or incarceration.

90.     In addition to the above, multiple Mesa defendants have participated in other mentioned racketeering schemes including insurance fraud. And they have used their official positions to steal from the City of Mesa treasury.

**The 2012 Extortion Scheme Against Plaintiff**

91.     Plaintiff met Brittany Rae Chavez ("Brittany") on October 13, 2014.

92.     At that time, Brittany already knew Plaintiff. In fact, unbeknownst to Plaintiff, Brittany had known of him for at least two years. To wit:

93.     In 2012, she and her mother, Dawna Rae Chavez ("Dawna"), were paid to set up an extortion scheme against Plaintiff.  The extortion scheme was intended to derail an investigation into Russian organized crime, specifically the smuggling of foreign goods into California and the laundering of payments thereon in California and Arizona.

94.     Since at least 2004, Brittany and Dawna have set up multiple extortion schemes by creating fraudulent default judgments and recording the same with local county recorders.  In Maricopa County alone there are several hundred such judgments that have been discovered to date.

95.     In the case of Plaintiff, the scheme was created in or about late 2011.  The phony default judgment application was uploaded through computer hack into the Los Angeles County Superior Court database.  This took place on or about May 31, 2012.

96.     The application for judgment purports to have been prepared and executed by attorney "Paul Tokeshi."  This individual is a phantom attorney—he does not exist.  However, "Paul Tokeshi" is listed in the California State Bar database as having become a California attorney in 2008.

97.     The fake admission and profile of Paul Tokeshi appears to have been the product of computer hacking.  The office of the California Attorney General and State Bar of California are currently investigating.

98.     The signatures of Paul Tokeshi match multiple handwriting samples of Brittany.  The handwriting also matches that used by Brittany in the formation of a 501(c)(3) organization ("D.A.M.E.S."), in Arizona also used to launder money. The company was recently suspended for failure to file its annual report.

99.     The judgment document has certain hand printed fill in sections and a hand printed signature allegedly belonging to Judge Leland Harris of the Los Angeles County Superior Court.  Judge Harris never executed the alleged judgment nor filled out any information on it nor had any such case in his courtroom.  The hand printing of added information and the hand printing demarking the signature of Judge Harris are forgeries.  The handwriting/hand printing matches

Brittany's handwriting/hand printing.  The alleged "certification" by the court clerk has also been identified as Brittany's handwriting.

100.   The named plaintiff in the action is Tarzana Falls Homeowners Association. Plaintiff lived in Tarzana Falls from April 2007 through April 2011.  A dispute did arise between Plaintiff and the HOA regarding certain special assessments, but that dispute was fully resolved in early June 2012 without litigation when plaintiff sold his unit in the complex.  The president of Tarzana Falls, Anthony Donato, has disavowed the judgment or any legal action leading to a judgment and states categorically that all issues regarding assessments was resolved at time of the sale.

101.   Tarzana Falls' accounting documents support Donato's position.

102.   In early 2014, an Application for entry of the phony judgment as a foreign state judgment was filed in Maricopa County by Defendant Mark Lammers. There are multiple flaws with that paperwork including the misspelling of Plaintiff's name and the mailing of the application and entry documents for Arizona to an address Plaintiff had not lived at since April 2007—thus ensuring that Plaintiff never received notice of the California judgment nor notice of the application and entry of the Arizona foreign state judgment.

103.   Once obtained, the Arizona judgment was recorded with the Maricopa County recorder and there it sat.

104.   In April 2015, Brittany and Plaintiff were engaged.  Brittany suggested that they sell their residences to purchase a larger new construction residence in Gilbert, Arizona.

105.   At the time, Plaintiff owned a small home in Phoenix; Brittany allegedly owned a townhome in Scottsdale.

106.   However, though Brittany was the legal owner of the townhome, she was not the beneficial owner.  In fact, the townhome was purchased using laundered monies obtained through the criminal enterprises.  The property was being used to store and move laundered cash.

107.    Brittany concealed these facts from Plaintiff.  She also concealed the fact that the "sale" of her residence was phony and was set up solely to transfer laundered money into a new property that she would purchase with Plaintiff.

108.    Brittany's residence was "sold" in July 2015.  Also in July 2015, during an escrow for sale of Plaintiffs residence, the title company discovered the phony judgment lien and informed Plaintiff.  Plaintiff then obtained the pleadings in the Arizona case and immediately contacted Lammers.  Plaintiff did not receive any response for three months. Meanwhile, Plaintiff could not sell his home without paying the judgment of $12,000 plus "interest" and "attorneys' fees" for Lammers' alleged attempts to collect on the phony judgment.

109.    On or about November 4, 2015 when a response was finally received, Lammers and his associate, Sarah Epperson, stated that the judgment was valid and that Plaintiff owed the money.  At the time Lammers and Epperson made that statement, they knew it was false and that the alleged California judgment was a fraud.

110.    Lammers and Epperson also stated that they intended to take Plaintiff's judgment debtor examination as soon as possible. To that end, they had made and continued to make application to the Maricopa County Superior Court for an Order requiring Plaintiff to submit to a judgment debtor examination.

111.    In researching Arizona law, Plaintiff discovered that the homestead act protected $150,000 of equity from the sale of a residence and that therefore, whether valid or not, the judgment could not be collected through Plaintiff's property sale.

112.    When Lammers was informed of the homestead act and its application to the present situation, on Brittany and Dawna's instruction, Lammers filed a new lawsuit alleging that a September 2014 transfer of the residence to a revocable living trust in Plaintiff's name constituted a fraudulent transfer.  Along with filing and serving the new lawsuit, a lis pendens was recorded on Plaintiff's residence thus preventing it from being sold.

113.    Doing so constituted an actionable abuse of process.  First, under the law in all 50 states, a transfer of a property to a revocable living trust is not a fraudulent transfer; second, even if

the transfer were fraudulent, the homestead act still protected $150,000 of equity. Brittany, Dawna and Lammers knew this but filed the lawsuit anyway.

114.    Moreover, in another abuse of process, just prior to filing and serving the new action and recording the lis pendens, in early December 2015, Brittany, Dawna and Lammers paid an individual to pose as a "buyer" and to enter into a "purchase agreement" for Plaintiff's residence. The purpose was to have Plaintiff and the ersatz buyer open an escrow at the location chosen by the buyer. The escrow/title company would then request various financial documents from Plaintiff that evidenced location of assets. Upon providing the same, Lammers would subpoena the escrow file and get the documents.

115.    In fact, the escrow/title company requested documents and in fact, Lammers subpoenaed the same. A copy of said subpoena was not provided immediately to Plaintiff but rather was mailed to the old California address where the foreign state judgment documents had been mailed. That action, committed in bad faith, prevented Plaintiff from objecting to the subpoena or stopping the production of the documents.

116.    Over the next three months, Plaintiff threatened Lammers with an action for abuse of process. In March 2016 before the attorney eventually capitulated and expunged the list pendens and dismissed the new lawsuit. Within ten minutes of filing the dismissal, the ersatz buyer canceled the sale.

117.    Plaintiff's house ultimately sold in late April 2016.

**The House Purchase Con**

118.    As part of the compensation provided to Brittany and Dawna for their services, the Mesa defendants provided them with housing. Though their places of residence were in their name, they were/are not the beneficial owners of the properties.

119.    At the time that Plaintiff and Brittany met, she resided at 5977 E. Thomas Road, Scottsdale, Arizona. Though Brittany was the legal owner of the property, she was not the beneficial owner. And therefore, any proceeds from a sale would not belong to her.

120.    Brittany concealed this information from Plaintiff.  The phony judgment extortion attempt was just the first part of the con.  Because the monies obtained from the sale of the Thomas property did not belong to Brittany, the new house purchased by Plaintiff and Brittany in September 2015 in Gilbert using monies obtained in the sale could not be in Plaintiff's name.  To keep Plaintiff, who provided $38,400 to the down payment, from being on title, Brittany convinced Plaintiff that only she should be placed on title to prevent the recorded lien from the phony judgment from having any effect.

121.    Plaintiff provided the initial deposit of $400 for the new construction and an additional $38,000 for the down payment.  The couple agreed that when the Tarzana Falls matter was resolved, Brittany would execute a spousal transfer deed providing to each spouse ownership of the property in joint tenancy.

122.    At the time Plaintiff provided the $38,000, Brittany concealed from Plaintiff the fact that the $27,000 she was also providing for the down payment, a portion of which was coming from alleged profits from the sale of her residence, was not her money but rather represented laundered monies from the criminal enterprises and that she would never be the beneficial owner, in part or in full of the new residence.  To protect those facts, Brittany represented falsely that the mortgage company required Plaintiff to sign a "gift" note confirming that the $38,000 and $400 were gifts and not part of a joint tenancy arrangement.

123.    In June 2018, Plaintiff prepared the deed for Brittany to execute placing the residence in joint tenancy. For two months, Brittany never signed the document. Thereafter, upon signing it, she failed to record the document despite representing to Plaintiff that she had done so.

124.    Almost every mortgage payment on the new Gilbert residence was paid by Plaintiff.

125.    During the pendency of the phony Arizona "dissolution" action, described in greater detail below, Brittany falsely claimed that Plaintiff never intended to be an owner of the property and that the $38,000 provided to her was a mere wedding gift and nothing more.

126.    By stipulation of the parties and order thereon, the Gilbert residence was allegedly sold on April 29, 2020.

127.    But no sale took place.  As is discussed in detail below, a fraudulent restraining order allegedly obtained on December 12, 2019, caused Plaintiff to make living arrangements outside of the family residence.  Plaintiff did not choose the selling agent, Jason LaFlesch, a participant in property purchases used in the racketeering schemes.  Plaintiff was not provided with a copy of any of the sales documents including the Closing Statement.  Rather, Plaintiff was informed of the sale price and the closing date.

128.    Plaintiff has demanded copies of all documents pertaining to the sale.  To date, he has been refused.

129.    In fact, there was no sale. Documents were falsified to make it look like the property sold at $448,000.  That price represented a reduction from the fair market value of the property at $475,000.  Further, the fraudulent deal was set up to read that certain closing costs and fees would be paid by the sellers.  Those reductions and the alleged commission dropped the net amount significantly.  After the remaining balance on the mortgage with SunTrust was paid, $172,000 remained.

130.    Even from that sum, Plaintiff should have received the return of his $38,400; Brittany should have received return of her $27,000 (she used for the down payment) And the remaining balance should have been split.  That means Plaintiff was and is owed $91,200.

131.    Taking into account the intentionally artificially lowered value and the alleged seller expenses, Plaintiff would be and is entitled to an additional $20,000 for a total of $111,200.

132.    Participating in the phony sale scheme were Dawna's boyfriend, Defendant Lawrence Cairo, and his friends, Defendants Falbo who posed as the "buyers."

133.    Also participating in the phony sale scheme were Defendants Erica Gadberry, Brittany's first attorney in the phony divorce case, and Greg R. Davis, Brittany's second attorney in the phony divorce case.  Both attorneys made material misrepresentations to Plaintiff about the sale and the sale proceeds.  Both have refused all requests and demands for an accounting.

134.    These damages are based on the value as of March 2020. Since the property never changed hands and has gained significantly in value, Plaintiff is entitled to more than $150,000 from his joint tenancy ownership of the property.

135.    Plaintiff never received anything from the sale. Brittany and her lawyers falsely claimed a) that Plaintiff's community property interest was only in the gain of the value during the marriage and that he had no separate property interest in that the $38,400 was a "gift." Then they claimed that they had run up legal expenses prosecuting the dissolution that met or exceeded any amount owed to Plaintiff.

136.    To date no one can account for any of the money.  That includes the escrow company, JetClosings, or the attorneys whose trust accounts were to receive the same.  Multiple requests for accountings have been ignored.  All requests for documents incident to the sale have been ignored.

137.    Moreover, Plaintiff is informed and believes and thereon alleges that equity was removed from the family residence and thereafter used to pay off a trust deed on the house where Dawna resided at 9502 E. Olla Circle, Mesa, Arizona 85212.

**Plaintiff's Discovery of the Racketeering Enterprises**

138.    McKinley was born on December 12, 2017 to Plaintiff and Brittany.  In February 2018, Plaintiff was already hot on the trail of the phony California judgment.  Plaintiff prepared a revocable living trust to include his and Brittany's assets.  To complete the trust, Plaintiff needed the legal description of their residence.  So he logged on to the Maricopa County Recorder's search engine to locate the property's trust deed.

139.    What he discovered were an array of falsified deeds in the names of Brittany's parents, Dawna and John.  The irregularities included ever changing signatures and fake notarizations.  He also discovered an array of falsified deeds allegedly belonging to relatives- except that the relatives did not exist.  At that time, nearly all of the properties in question were located in Mesa.

140.     Plaintiff thought that he had stumbled onto money laundering to evade taxes within the Chavez family.  But the family fraud led to hundreds of additional deeds with falsified signatures and fake notarizations.  It also led to the discovery of fake mortgage companies whose formation documents were prepared by Brittany. The discovery of those documents led to trust deeds in the names of public officials where the signatures on the deeds were not a match to the official in question and where the notarizations were fraudulent.

141.     The public officials include judges, city attorneys and other lawyers representing city agencies, clerks, police officers, and certain key staff positions.

142.     The deeds also include stash houses and cash houses spread throughout the greater Phoenix valley.

143.     In simple terms, laundered cash is paid to public officials as bribes through the creation of phony mortgages on purchased properties. By example, the bribed official purchases a new residence. He provides a 20% down payment and obtains a "mortgage." Except the mortgage and the mortgage company are fake.  Monthly payments normally paid to a real mortgagee are not collected.  Nothing shows up in a bank statement or in any other kind of account that could be traced.

144.     Though Brittany reduced her participation in the criminal schemes after her engagement and marriage to Plaintiff, she continued to participate in them.  After the birth of McKinley, Brittany decided that she wanted out altogether. With Plaintiff slowly discovering her double life, Brittany determined that the most effective way to escape was to provide Plaintiff with enough evidence for him to take action to protect her and McKinley and get her into WITSEC, the federal witness protection program.

145.     To that end, Brittany did the following:

146.     First, Brittany told Plaintiff that she was in trouble with those whom she believed could harm her, McKinley and Plaintiff.  Though she would not elaborate at that time, Brittany did provide an array of documents evidencing the criminal enterprises, especially the money laundering.

147.    Second, Brittany began hoarding cash.  She did so in two ways: first, she removed her mother from her checking account so that Dawna could not see her income or her expenses. Thereafter, Brittany purchased goods for others on her Wells Fargo debit card and on her Chase and Discover credit cards, taking back cash.

148.    Third, Brittany also prepared to "kill" the phantom individual "Brittany Virginia Chavez," an "employee" at Dignity Health, in order to collect the life insurance proceeds (about $200,000).

149.    On November 2, 2018, Brittany filed a fraudulent bankruptcy for Brittany Virginia Chavez to clear all unsecured debt prior to setting up her demise.  But in late November 2018, weeks before the 341a hearing was scheduled, Dawna discovered that Brittany was providing evidence to Plaintiff and that she intended to enter witness protection.  Said evidence included a portable hard drive containing encrypted and non-encrypted records of the racketeering activities over approximately 10 years, five years of cell phone and text records related to Brittany and Dawna's Verizon cell phones plus records of calls made from VOIP cell phone apps.  These records evidence communications with public officials receiving bribes and communications with drug/narcotics distributors.

150.    Dawna also discovered that Brittany was intending to collect on the proceeds of life insurance from a deceased Brittany Virginia Chavez.

151.    Fearing that Brittany would enter WITSEC and provide evidence that could be used to prosecute Dawna, other family members, and the Mesa defendants, Dawna told the Mesa defendants that which Brittany was intending.

152.    In response, Dawna and the Mesa defendants made threats at Brittany, which included bodily harm to Plaintiff if she tried to enter WITSEC or if she continued to provide Plaintiff with any evidence of their participation in the racketeering schemes.  They also told Brittany that if Plaintiff discovered all that she had done, he would leave her taking two-year-old McKinley with him; that Plaintiff would likely move to another state and file for annulment; and he

would seek full custody.  Meanwhile, Plaintiff would act to have Brittany indicted and imprisoned. No freedom and no child.

153.   Brittany was then told by Dawna and the Mesa defendants that she needed to file for divorce immediately.

154.   Further, these defendants cut off Brittany's income from her participation in the criminal enterprises until she perfected the divorce.

155.   But Brittany resisted. To fool these defendants, Brittany filled out the Maricopa County form dissolution documents in November 2018, January 2019, March 2019, and May 2019. Meanwhile, she continued to provide critical information concerning the racketeering enterprises to Plaintiff.

156.   With a lack of additional income and with constant threats from these defendants directed at Plaintiff, Brittany responded in two ways:  first, she stole business and personal debit cards and credit cards from Plaintiff's wallet and then provided the same to other parties to use in exchange for cash; second, she convinced Plaintiff to obtain a $200,000 life insurance policy.

157.   In early April 2019, Dawna discovered Brittany was not intending to file divorce papers, that she was using Plaintiff's credit and debit cards to supplement the withheld income, and she was continuing to provide evidence to Plaintiff.  Thereafter, Dawna and the Mesa defendants conspired to do the following:

    a.   Attempting to kill Plaintiff.  On April 20, 2019, a strategically placed cut was made to the right front tire of Plaintiff's rental automobile for the purpose of causing Plaintiff to have a severe incident.

    b.   Poisoning Plaintiff. Continually spiking Plaintiff's beverages with low level narcotics to cause Plaintiff confusion and exhaustion thus preventing him from furthering his investigation of the racketeering enterprises. On the night of July 7, 2019, the spiking almost resulted in Plaintiff's death when he ingested poisoned home brewed iced tea that had been provided for him just as he left his and Brittany's home.

c.   Disrupting Plaintiff's law practice through computer hacks: From April 2019 to the present, Dawna and the Mesa Defendants have utilized the services of others to hack into Plaintiff's law office computers and into the computer systems of his clients for the purposes of disrupting his practice and his income.

158.   Meanwhile, during the Summer 2019, Plaintiff discovered that his personal and his office's credit and debit cards were being stolen and used for purchases in the greater Phoenix area and over the Internet. In late September 2019, the credit/debit card issuers requested that Plaintiff file a police report.

159.   Fearing an investigation of the credit/debit card theft and that such an investigation might lead to the discovery of the criminal enterprises, on October 7, 2019, the day Plaintiff intended to file a police report regarding the stolen credit cards and debit cards, Brittany panicked. She filed a fraudulent police report, wherein Brittany made false claims that Plaintiff was acting "manic and erratic" during the early morning hours.

160.   The Gilbert Police investigated and found no evidence to support Brittany's false claims.

161.   With Brittany's stunt came a newly founded fear by Dawna and the Mesa Defendants that either Plaintiff would increase his efforts to investigate the racketeering enterprises.

**The Abduction of McKinley Harris Thaler**

162.   Said Defendants then concocted a new scheme involving McKinley wherein Brittany would leave her marriage on McKinley's second birthday taking McKinley with her. Brittany would stay at Dawna's residence.  A falsified Order of Protection in Brittany's name would be prepared and uploaded into the City of Mesa police database.  When Plaintiff came to Dawna's residence to see his son, the Mesa police would arrest Plaintiff for violating the restraining order.

163.   Said defendants also stepped up their hacking of Plaintiff's law office computer and hacked into his cell phone with various spyware apps.

164.   Brittany did not intend to take McKinley.  Instead, on or about November 17, 2019, Brittany requested that Plaintiff arrange for her to enter WITSEC.  In the meantime, Brittany gave the appearance of cooperating with Dawna and the Mesa Defendants.

165.   Through the hacking of Plaintiff's computer and cell phone, Dawna and the Mesa Defendants discovered Brittany's true intentions.  Thereafter, the Mesa Defendants threatened to cause financial, legal and physical harm to Plaintiff if she did not cooperate.  Brittany capitulated to the threats.  To that end:

166.   On December 12, 2019, a phony Order of Protection was created and then filed with the City of Mesa Police Department.

167.   The falsified Order of Protection contains case number FC2019-098471.  The following day, December 13, 2019, the alleged Dissolution of Marriage was filed.  That case number is FC2019-098211. Therein lies the problem.  Both cases are phony.  The case numbers were extracted from the Maricopa County Superior Court's database.  The higher case number cannot be issued prior to the lower case number.  Moreover, 098471 was not an available case number as of December 12, 2019.  Nor was it available on December 13, 2019.

168.   Moreover, a review of cases within 5 digits of the Order of Protection case number confirm that these case numbers were pulled from the court database system and then randomly used in racketeering schemes subsequent to December 12, 2019.

169.   But there's more. Brittany did not sign the Order of Protection application.  Dawna did.  Brittany never appeared in Court on December 12, 2019.  The order is allegedly signed by Judge Richard Nothwehr.  The signature is a forgery. And a review of Nothwehr's trust deeds confirms that he received bribes through the Chavez s phony mortgage system prior to and after the December 12, 2019 Order of Protection date.  Judge Nothwehr's most recent trust deeds evidence Brittany's handwriting on the notarization under an assumed name.

170.   By that Order, Plaintiff was required to leave the residence. Thereafter, Dawna and the Mesa defendants, searching for materials implicating them in the criminal enterprises, stole

Plaintiff's confidential client files and other related confidential documents from the designated

office section of the family residence.

171.    Also by that Order, Dawna and the Mesa defendants prevented Plaintiff from being

with his son on his son's birthday and they preventing communications between father and son

until December 21, 2019.

172.    Plaintiff did not act in violation of the phony restraining order.

173.    On December 29, 2019, Brittany met with Plaintiff secretly for three hours to

provide Plaintiff with additional information about the Mesa defendants and the criminal

enterprises including information regarding the transfer of bribe monies through phony trust deeds.

174.    When Dawna discovered the meeting, she informed the Mesa defendants who

schemed to use City of Mesa resources including police and judiciary to disrupt Plaintiff's life.  To

wit:

d.    Having cloned Plaintiff's cell phone, sending text messages to Brittany's cell phone
appearing to have come from Plaintiff's cell phone, and thereafter, filing a plethora of
fraudulent police reports claiming falsely that Plaintiff was violating the OOP order.
This started on December 31, 2019, when a complaint was made to Brian Bullock, an
officer of the Gilbert Police Department, also a bribe recipient.  The complaint stated
that Plaintiff had harassed Brittany earlier in the day by sending to her a series of text
messages in violation of the restraining order.  However, Plaintiff, who had been
hospitalized since the night of December 29, 2019 was receiving an angiogram at
Banner Heart Hospital and could not have sent messages to Brittany.

e.    Coercing Brittany into refusing Plaintiff any overnight visits with McKinley for
approximately one month and then attempting to limit Plaintiff's time with McKinley to
less than 25% to cajole Plaintiff into communicating with Brittany in violation of the
phony restraining order.

f.    On February 20, 2020, having Dawna commit perjury by falsely claiming that in May
2019, she witnessed a drug transaction between Plaintiff.  This perjured testimony was

intended to cause the court to award sole custody of McKinley to Brittany and thus cajole Plaintiff into acting in violation of the phony restraining order.

g.   Also on February 20, 2020 at the time of the custody hearing, Dawna voluntarily agreed to act as facilitator of the 50/50 custody exchanges between the parties.  At that time, Dawna and the Mesa defendants intended for Dawna to have her own restraining order that contradicted the Family court order requiring Dawna to facilitate the exchanges. This would give cause to "violations" of the Mesa restraining order and thus a basis in which to charge Plaintiff with said violations.

h.   On or about February 21, 2020, coercing Brittany into filing a fraudulent police report claiming that she had discovered two glass pipes under Plaintiff's sink in the master bathroom.

i.   Constant harassment by creating phony reports of restraining order violations and then having Mesa police officers contact Plaintiff while McKinley was in his custody and insisting on discussing the false allegations.

j.   On or about April 4, 2020, abducting McKinley in violation of the February 20, 2020 Court Order and holding McKinley through Plaintiff's birthday in an attempt to cajole Plaintiff into violating the phony restraining order.

k.   In or about late April 2020, creating the phony restraining order for Dawna and uploading the same to the Mesa police database.  Just after Brittany violated the Court's custody order, the phony restraining order was prepared for Dawna using Defendant Tatz' signature and then uploaded it into the Mesa City Court system.  The order directly contradicted the February 20, 2020 custody order.  Said order was/is not permissible under Arizona statutes which require said orders to be issued by and violations thereon to be heard by the Family Court handling the dissolution and custody matters.

l.   Preventing McKinley and Plaintiff from being together on Plaintiff's birthday, on Father's Day, and on the Jewish New Year (Rosh Hashanah).

m.  After Brittany and her attorney failed to change the custody order at a June 10, 2020 Family court hearing, inventing false charges against Plaintiff for violating the phony restraining orders and filing phony claims with DCS that Plaintiff was abusing McKinley in some unspecified manner.

n.  On September 19, 2020, refusing to make the exchange and thereafter, refusing to make any exchanges with Plaintiff in violation of the February 20, 2020 temporary child custody order.

o.  Filing on September 21, 2020, an ex parte motion, without service of the same, stating falsely that the Court Appointed Adviser agreed with Brittany that Plaintiff was unfit to parent McKinley and that Brittany was justified in refusing to make the September 19, 2020 exchange.

p.  On or about September 25, 2020, making false charges with the Gilbert Police Department that Plaintiff was in some manner, again unspecified, abusing McKinley as a way of justifying her violation of the Court's order. (Gilbert detectives later concluded that Brittany and Dawna had made false statements to them.)

q.  Thereafter, Dawna failing and refusing to act as Facilitator and instead, using the cloned phone of Plaintiff and a cloned phone of Brittany to send through Plaintiff's cloned phone to Brittany's cloned phone harassing messages and then reporting them as having come from Plaintiff, in order to have false charges filed against Plaintiff.

r.  From September 19, 2020 to the present, holding McKinley hostage under the demand that Plaintiff recant any and all statements he has made regarding the illegal activities that are set forth in this complaint, under the threat that he will never see his son again if he does not do so.

s.  On December 12, 2020, failing and refusing any and all communications between Plaintiff and his son to wish his son a happy birthday, having refrained from permitting any communication since beginning of October 2020 and continuing to refuse to do so to this date.

t.   Further Brittany and Dawna refusing to allow any of Plaintiff's friends or family to wish McKinley a happy birthday and refusing to permit anyone to see or speak to McKinley when dropping off gifts.

175.   As to the dissolution filing on December 13, 2019, it too has Dawna signing Brittany's name and thus is void.

176.   The timing of the April 4, 2020, abduction of McKinley was not random.  It came shortly after Marvin L. Davis was appointed to the bench as a judge and assigned to the dissolution case.  That appointment was made by Judge Bruce Cohen.  Judge Davis, like many of the judges in Maricopa County, accepted bribes prior to his appointment as Commissioner in January 2017.  In fact, trust deeds evidence that Davis took bribes as early as 2016, one year before being appointed as a Commissioner of the Maricopa County Criminal Court.

177.   All of Plaintiff's efforts to obtain McKinley were ignored by Davis.  Said efforts included emergency motions, a Writ of Habeus Corpus,  and an application for contempt against Brittany.

178.   Further, in violation of the UCCJEA, the Mesa Police Department, under instruction from the Mesa Defendants, refused to obtain McKinley from Brittany despite the February 20, 2020 Custody Order.  Officers, including Defendant Jacob G. Roessler (also a bribed public official), stated that the City of Mesa had a policy prohibiting officers from obtaining children from a parent violating a custody order even if a Superior Court Judge specifically issued a new Order requiring the department to do so.  These actions prevented McKinley from being with his father on Plaintiff's birthday, April 12.

179.   Again, Dawna and the Mesa Defendants intended for Plaintiff to become irate and act out in a manner violative of the phony restraining order. That plan failed.

180.   From April 4, 2020 through April 17, 2020, even though Brittany worked from her new residence, she brought McKinley to her mother's house almost every day. When Dawna realized that she had no legal rights to McKinley and that Plaintiff could simply come to her house

and take his child, Dawna falsified an Order of Protection with a forged signature of the City of Mesa's Presiding Judge, John P. Tatz.

181.    As with the Superior Court judges, the deeds belonging to Mr. Tatz evidence acceptance of bribes through the Chavez scheme of phony mortgages notarized by Brittany yet again using assumed names.

182.    McKinley was returned on April 18, 2020.

183.    For Father's Day 2020, Plaintiff's request to have his son for the day was refused—again in the hope that Plaintiff would act in violation of the phony restraining orders.

184.    Further, Dawna provided Plaintiff with a twelve-page manifesto claiming that Brittany would never allow Plaintiff to act as McKinley's father and that if he agreed to settle the Dissolution case, he would be provided with two hour once per month monitored visitation sessions. Yet again these antics were intended to cause Plaintiff to become angry and violate the phony restraining orders. That plan failed.

185.    Next, Dawna and the Mesa Defendants attacked Plaintiff's finances.  To wit: during the summer 2020, multiple phony orders with forged signatures of Marvin L. Davis were "issued" that essentially allowed Brittany to keep all proceeds from the stipulated sale of the family residence and that provided her with child support of $1,450 per month without any evidence to support the same, despite the fact that McKinley was spending twice as much time with Plaintiff as he was with Brittany, and despite the fact that Plaintiff's earnings were at or below Brittany's earnings especially due to the COVID-19 quarantines.

186.    Also during the Summer 2020, Dawna made two separate complaints to the department of Child Protective Services alleging an array of oddities. Both investigations concluded that no evidence of any kind existed to substantiate even a single bizarre charge made.

187.    By August 2020, McKinley did not want to return to his mother's house.  By late August 2020, McKinley was having nightmares.  He told his father that his mother and grandmother told him that he was not permitted to discuss with dad anything he was observing at the Chavez household. He also expressed a very intense fear that mom and grandma were going to

take him away and he was never going to see his dad again.  McKinley is a high IQ child.  He was able to articulate that which he was witnessing.  This included actions taken by Brittany and Dawna and other defendants in furtherance of the criminal enterprises.

188.   Confused by what he was seeing and hearing, McKinley would ask dad and others to explain.  Further, Brittany, Dawna and Defendant Cairo were fighting daily in front of McKinley.  Confused by what was happening, he would ask dad and others to explain.

189.   As McKinley had feared, for a third time, on September 19, 2020, yet again, Dawna refused to exchange McKinley.

**The Break-in of Plaintiff's Residence and the Assault on Plaintiff's Houseguest**.

190.   Two nights before a third custody hearing (October 20, 2020), The Defendants feared that the racketeering activities would be brought to light.  To prevent that from occurring, Dawna and the Mesa Defendants paid Defendant Roessler additional monies from the proceeds of the "Gatti" policy to hire men dressed as City of Mesa police officers to break into Plaintiff's home.  They were instructed to physically assault Plaintiff to obtain the portable hard drive and other evidence Brittany had provided to him concerning the racketeering activities.

191.   The break-in occurred on October 18, 2020.  Plaintiff was not at home.  However, a client, Richard Salazar, was staying in Plaintiff's home.  Mistaking Salazar for Plaintiff, Salazar was beaten and tied up while the house search was conducted.

192.   Plaintiff discovered the assault had occurred the following morning.  Fearing for his safety, Plaintiff left Arizona.

**Falsifying Charges and Convictions for Violating Void Orders of Protection**

193.   The Mesa Defendants and Dawna have continually sought to damage Plaintiff with false charges and convictions thereon for invented violations of the phony restraining orders.  In addition to the conspiracy between the Mesa defendants, Defendant Tatz and Dawna, these defendants conspired with Defendant Lawler to act as follows:

a.   During the period of April 4, 2020 through April 17, 2020 and then from September 19, 2020 through October 18, 2020, the Mesa Defendants and

Dawna ensured that Plaintiff's multiple reports of custodial interference and child abduction were never acted on or charged;

b.  Further said Defendants and Defendant Roessler violated the UCCJEA as codified in Arizona by refusing to enforce the February 2020 Custody Order or subsequent orders;

c.  Moreover, said Defendants informed Plaintiff that even if he obtained a writ of habeas corpus or other Superior Court order directing the Mesa Police Department to obtain McKinley, the police department would refuse to comply with the order;

d.  On or about April 24, 2020, the Mesa Defendants, Dawna and Defendant Tatz falsified a restraining order for Dawna against Plaintiff and did so knowing that the City of Mesa did not have subject matter jurisdiction to issue said order or to enforce it.

e.  Moreover, said defendants knew that the order directly contradicted requirements set forth under the February 20, 2020 Custody Order but issued the order anyway with the intent of falsely charging Plaintiff with violations of it;

f.  Thereafter, said defendants took action to charge Plaintiff even though the restraining order was phony and even though the City of Mesa did not have jurisdiction to charge for any alleged violations.

g.  On October 12, 2020, Defendant Roessler effected an arrest of Plaintiff at his residence in Gilbert, Arizona by falsely claiming that Plaintiff had sent text messages to Dawna that Roessler knew Plaintiff had not sent;

h.  Since September 19, 2020, the City of Mesa has failed and refused to charge Dawna or Brittany with custodial interference or child abduction despite the multiple abductions of McKinley in violation of the February 20, 2020 Custody Order;

i. Instead, the Mesa Defendants, Dawna and Roessler charged Plaintiff with 21 counts of violating the phony restraining orders held by Brittany and Dawna when they knew the orders were phony and that no such violations occurred;

j. The Mesa Defendants and Dawna then ensured that the Notices of the false violations were sent to the wrong address so that Plaintiff would not know to appear at his arraignments;

k. Thereon, the cases were assigned to Defendant Lawler with the intent that Lawler would effect convictions and incarceration;

l. Defendant Lawler issued warrants on the charges knowing that the orders were phony, that the alleged violations were invented and that Plaintiff had not received proper notice of arraignment hearings;

m. Even after Plaintiff retained counsel, Defendant Lawler refused to quash all warrants unless Plaintiff paid $35,000 in bail, an amount she knew Plaintiff did not have. Defendant Lawler did this for two reasons: it would prevent Plaintiff from returning to Arizona to work on his defenses; and it would prevent Plaintiff from being able to see McKinley. Further, it would cause Plaintiff to be arrested if he were found to be in the state;

n. Thereafter, Defendant Lawler then refused motions to reduce bail so that Plaintiff could prepare his defenses or see his son;

o. Thereafter, Defendant Lawler refused to postpone trial dates to allow Plaintiff the time necessary to prepare his defenses and to ensure witnesses could appear especially as several key witnesses would be coming from out of state;

p. Thereafter, Defendant Lawler refused to postpone the trial dates even after Plaintiff's medical condition rendered him unable to travel to Mesa for trial. Moreover, Defendant Lawler refused to permit Plaintiff to appear by alternative means such as WebEx or Teams etc;

q.  Defendant Lawler then held trials in absentia on 14 of the charges in violation of Plaintiff's due process and equal protection rights;

r.  At no time prior to trial was Plaintiff provided with the substantive allegations and therefore had no ability to prepare defenses.

s.  Further, Defendant Lawler ordered Charles Naegle, the attorney retained by Plaintiff to enter "not guilty" pleas, to act as trial counsel for Plaintiff even though she knew that Naegle had never met with Plaintiff, had not prepared for trial, and had not discussed the individual charges with Plaintiff. Defendant Lawler made such an order to give the appearance that the trial was fair when in fact the outcome was pre-ordained;

t.  When Plaintiff did return in December 2021 to meet with attorneys regarding the acts of these defendants, the City of Mesa police officers illegally and without warrant tracked multiple vehicles and cell phones belonging to friends of Plaintiff and then sent multiple undercover officers to locate and arrest Plaintiff.

u.  After Plaintiff's arrest on December 26, 2021, Defendant Lawler required Plaintiff to pay a cash bond of $100,000. Defendant Lawler did so knowing that Plaintiff would not be able to pay the bond personally and therefore would remain in jail. Defendant Lawler, the Mesa defendants and Dawna intended by Plaintiff's incarceration that Plaintiff would not have an opportunity to prepare legal pleadings or take other measures to appeal her actions and that even if Plaintiff paid the bond, he would not have the money necessary to hire qualified legal counsel. Simply the Mesa Defendants, Dawna, Tatz and Lawler intended to prevent Plaintiff from pursuing appropriate remedies including legal action against the City of Mesa in further violation of Plaintiff's rights;

v.  On or about January 3, 2022, after the Town of Gilbert issued a $300 bail on an alleged December 31, 2019 violation of Brittany's phony Brittany restraining order, the Mesa Defendants, Dawna, Tatz and Lawler took action to have Gilbert judge raise the bond raised to $75,000 yet again intending to keep Plaintiff in jail and thus preventing him from hiring qualified counsel or from taking action against these defendants.

w.  At the time of the sentencing hearing on February 3, 2022, Defendant Lawler refused to permit Plaintiff's attorneys from the Nolan Law Firm to represent him and instead required Charles Naegle to represent Plaintiff in spite of Naegle's motions to withdraw and Plaintiff's consent to it, all in violation of Plaintiff's right to counsel of his choice.

x.  The Mesa defendants and Dawna, by and through Deputy City Attorney Sabrina DeCosta met with Brittany in July 2021 telling her that the Mesa defendants would demand 13 years on incarceration and then reduce the same to a request for 6 ½ years of incarceration, Thereafter, on February 3, 2022, Ms. DeCosta demanded a ridiculous, excessive and unenforceable sentence of 13 years and then revised her demand to 6 ½ years.  At the time of the demand. DeCosts knew that such a sentence was not legally available from a city court.  Defendant Lawler then sentenced Plaintiff to an excessive amount of jail time.

y.  Thereafter, Defendant Lawler then tried to enforce the sentence despite the Nolan Law Firm filing in person and electronically a Notice of Appeal. Lawler attempted these actions knowing that they violated Arizona law;

z.  Even after Defendant Lawler relented on immediate incarceration due to the filing of the Notice of Appeal, she then tried to raise Plaintiff's bail to an amount that she assumed he could not pay in order to circumvent the automatic stay from the appeal filing.

aa. Thereafter, Defendant Lawler not only ordered Plaintiff to remain in the State of Arizona, a state where he did not reside, but refused his request to travel for work (Plaintiff is licensed in California and has several cases pending for hearing and/or trial), or for medical treatment with his cardiologist in Las Vegas, Nevada.  So effectively, Lawler cut off Plaintiff's income and medical care in violation of Plaintiff's rights.

194.   As stated supra, these defendants took these actions to protect the racketeering schemes and their participation in them including their acceptance of bribes knowing that in doing so they were violating Plaintiff's civil rights and multiple federal statutes set forth above.

**The Kiffmeyer/Greg R. Davis Bribery Scam**.

195.   As part of the February 20, 2020 order, Commissioner Russell ordered the appointment of a Court Appointed Advisor with the limited role of determining whether any changes should be made to this physical custody order of 50/50 parenting time.  Barb Kiffmeyer was assigned to the position.  Her assignment was not random.

196.   Ms. Kiffmeyer purports to have a Master's degree in social work and is on the approved panel of Court Appointed Advisors.  So is Defendant Greg R. Davis.

197.   Plaintiff is informed and believes that over the past ten years, Davis and Kiffmeyer have had a personal social relationship and a business relationship wherein Davis compensated Kiffmeyer to fix reports to the Court in favor of Davis' clients.

198.   Knowing this, the Mesa Defendants took action to ensure that Kiffmeyer would be appointed to the dissolution of marriage case and would accept bribes in exchange for falsifying her report..

199.   In July 2020, Brittany replaced her first attorney, Erica Gadberry, with Greg R. Davis in order to facilitate the bribes to Kiffmeyer.  Thereafter, Dawna arranged through Davis for payment to Kiffmeyer for Kiffmeyer to do two things: a) allow Brittany and Davis to make false statements to the Court alleging that Kiffmeyer had concerns about Plaintiff's parenting skills when in fact she had no such concerns, and b) issue a report that omitted pertinent information about

Brittany, including her criminal conduct and mental health issues and omitted any positive information concerning Plaintiff, of which there was plenty, including that Plaintiff has a twenty year old son whom he successfully co-parented with his ex-wife.

200.    On September 19, 2020, Brittany refused to exchange McKinley claiming, in part, that Kiffmeyer had told her not to make the exchange. Brittany's statement was false and remained false when she and Davis filed a brief with the Court on September 21, 2020 stating the same.

201.    Subsequently, Kiffmeyer admitted that she had not told Brittany to refuse the exchange, but Kiffmeyer refused to report the same to the Court.

202.    Thereafter, Kiffmeyer authored a report that omitted the following:

a.  Plaintiff has a twenty-one year old son (then 19), with whose mother he co-parented successfully (who provided a declaration stating the same). Matthew attended University of Colorado in Boulder Colorado, where he was a Deans List candidate and a Premed Major. (He currently attends UC Berkeley.)

b.  Plaintiff was McKinley's primary care giver from birth to the time he was stollen on December 12, 2019 and then again from late January until the time he was stollen on September 19, 2020. Until September 19, 2020, neither Brittany nor her mother, Dawna, ever complained once about the care McKinley received from Plaintiff.

c.  During the first half of 2019, Brittany encouraged Matthew to attend the University of Arizona, so that he could join her, Plaintiff and McKinley on weekends.

d.  Plaintiff was married to Melinda (Matthew's mother) for seventeen years. They co-parented Matthew from the time he was seven years old. They maintained residences approximately a quarter of a mile apart, and stayed in constant communication on all issues regarding their son. Moreover, Plaintiff and Melinda maintain a friendship to this day.  Melinda has met McKinley on several occasions, including having him over for dinner with Plaintiff in her home in Tarzana, California.

e.  The report omits Brittany's violation of the custody order on April 4, 2020 wherein Brittany withheld McKinley from Plaintiff for fourteen days.

f.  The report omits that Brittany violated the custody order a second time when she refused to make the exchange with McKinley on September 19, 2020. Since that time she has not permitted McKinley to see or talk to his father.

g.  The report omits that in their Brief dated September 21, 2020, which was kept from Plaintiff, Attorney Davis and Brittany lied to the Court when stating and implying that Ms. Kiffmeyer told Brittany several days earlier that she was within her rights to withhold McKinley from the September 19, 2020 exchange and that she should refuse to make the exchange.

h.  The report further omits that DCPS interviewed Plaintiff with McKinley and concluded that there was NO evidence of any kind to support a single allegation made by Brittany.

i.  The report further omits that McKinley's pediatrician and Phoenix Children's Hospital found no evidence of abuse whatsoever.

j.  At no time did Ms. Kiffmeyer interview either parent with McKinley, despite being asked to do so on numerous occasions by Plaintiff.

k.  And Ms. Kiffmeyer omits the forensic psychologist examination of McKinley on behalf of the Gilbert Police Department where it was found that Brittany was either lying or paranoid and that the detective in charge called Brittany following the exam to instruct her to exchange McKinley and resume all custody exchanges as ordered.  And Kiffmeyer omits that Dawna/Brittany refused to do so.

l.  Meanwhile, Kiffmeyer stated that Brittany had taken and passed two drug tests despite neither Kiffmeyer nor Plaintiff ever having received any evidence of the testing or its results.  In fact, no testing ever occurred and Kiffmeyer knew it.

203.  Plaintiff is informed and believes that the bribe payments were made to Defendant Kiffmeyer in late July 2020 and then again in late Fall 2020.  The monies for the bribes were provided by Defendant Dawna and given to Defendant Greg R. Davis who then facilitated the transfer of them to Defendant Kiffmeyer.

204.    The monies for the Fall 2020 payment came from the "Debra Gatti" MetLife life insurance policy payment received by Brittany and Dawna on or about October 5, 2020.

205.    Moreover, as stated above, Plaintiff is informed and believes that the Davis-Kiffmeyer bribery scam has been operating for many years with Plaintiff being one of numerous victims.

206.    Plaintiff requested proof of the $1000 fee paid to Kiffmeyer from the house sale proceeds numerous times, but each request was ignored.

**Postponing a Phony Divorce Trial Because the Bribe Money to Davis Had Yet to be Paid**.

207.    During the time Commissioner Russell remained presiding over the phony dissolution of marriage case, a trial date of October 20, 2020 was set.

208.    But that date was changed by Marvin L. Davis in late September 2020, at the request of Davis and just after the kidnapping of McKinley, when the "Gatti" MetLife payment got delayed by MetLife and Defendants Marvin L. Davis, Greg R. Davis, and Kiffmeyer had not yet received their bribe payments.  The delay was also intended to provide more time for Plaintiff to act in violation of the phony restraining orders.

209.    Having not received the entirety of his additional bribe for Thaler v. Thaler, Defendant Marvin L. Davis postponed the trial to December 29, 2020.

210.    In fact, on September 21, 2020, Defendant Marvin L. Davis was supposed to allow for Brittany and Dawna to issue a phony Order from an ex parte application secretly filed by Greg R. Davis.  The secret application falsely stated that Kiffmeyer "agreed" with Brittany that Plaintiff should not have any custody of McKinley.  The only basis for this ridiculous allegation was that Plaintiff believed Brittany and Dawna to be racketeers.

211.    Because he had not yet received the bulk of his bribe payment, Marvin L. Davis refused to allow the phony Order to be uploaded into the Court database.  However, having been promised by Greg R. Davis and Dawna that he would receive the money shortly, Marvin L. Davis agree to set a custody hearing on October 20, 2020 and reset the trial for December 29, 2020 while

taking NO action to force the return of McKinley to Plaintiff under the February 20, 2020 custody order.

212.    The policy proceeds of $375,000 were received by Brittany and Dawna on or about October 5, 2020 and were distributed to Marvin L. Davis, Barbara Kiffmeyer, Greg R. Davis, and Jacob G. Roessler and other public officials employed by the City of Mesa.

213.    With Marvin L. Davis having stopped the upload of the phony Order, Defendants Brittany, Dawna, and Greg R. Davis decided to discredit Plaintiff as follows:  first, Dawna and Brittany would file a false police report with the Gilbert police department alleging that Plaintiff had abused McKinley in some unspecified manner.  Then they would take McKinley to his pediatrician and repeat the false claims.  And finally they would take McKinley to Phoenix Children's Hospital again making the same false claims.

214.    In early October 2020, said Defendants did exactly that.  The only problem is that no abuse of any kind had occurred and as a result, the Gilbert police, the pediatrician, and Phoenix Children's Hospital stated as such.  In fact, the Gilbert police detective in charge told Brittany that she needed to return McKinley to Plaintiff forthwith.

215.    Immediately thereafter, Defendant Roessler was paid from the illegally obtained insurance proceeds to effect the false arrest of Plaintiff on October 12, 2020 for allegedly sending text messages to Dawna Chavez.

216.    The purpose of the arrest was two-fold: to discredit Plaintiff and to scare him out of any further investigation.

217.    On the night of October 12, 2020, Defendant Roessler and Officer Valdez arrested Plaintiff at his home in Gilbert without warrant or cause.  Plaintiff was released from Mesa's jail the following morning.

**The Art of Polygamy, not Oregami**

218.    Adding insult to injury, records obtained in several states including Arizona, New Mexico and Colorado evidence Brittany being married to at least 10 separate individuals prior (and during) her marriage with Plaintiff.  Plaintiff has not located any records of divorce.  Additionally,

recorded documents evidence property purchases by Brittany and her "spouse" before/during/after her marriage to Plaintiff.

219.    Spouses include: Ricky Glenn Goodwin, Jr., Justin Chavez and Justin Thomas Leonard in Arizona, and Victor Ray Gonzales (Colorado) and Mark Harrison (New Mexico) amongst many others.

220.    Plaintiff is informed and believes that these marriages are intended to aide in the racketeering enterprises especially because they provide a "spouse" who can claim the benefits of the fraudulently obtained life insurance policies. As a result, Plaintiff has made several requests for a paternity test for McKinley.  To date, all requests have been refused or ignored.

## FIRST CAUSE OF ACTION

*(Violations of 42 U.S.C. §1983 v. All Defendants)*

221.    Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 220 of this complaint as if fully set forth hereat.

222.    The plethora of acts of Defendants as alleged herein constitute violations of Plaintiff's civil rights.

223.    Said actions of all of these Defendants were taken in part to cover up the racketeering enterprises and the bribes to public officials that Plaintiff had discovered.

224.    Said actions were taken by these defendants with the knowledge that they were violating Plaintiff's civil rights as those rights are protected pursuant to 42 U.S.C. §1983.

225.    As a result of the violations by these Defendants, Plaintiff has been damaged in an amount at or exceeding $500,000 in losses from the fraudulent sale of his and Brittany's residence, from damage to his law practice, and from damage to his reputation in an amount according to proof at time of trial.

226.    Additionally, the violations alleged herein have caused Plaintiff general damages to his health and wellbeing including hypertension, headache, stomachache and Post Traumatic Stress in an amount according to proof at time of trial.

227.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Plaintiff's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

## SECOND CAUSE OF ACTION

*(Violations of 42 U.S.C.§1997 vs. City of Mesa, and County of Maricopa)*

228.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 227 of this complaint as if fully set forth hereat.

229.   The within Defendants as government agencies with independent police/sheriff's departments, City of Mesa and County of Maricopa are obligated to prevent officers from engaging in a pattern or practice of conduct that deprive a person of his/her rights.

230.   On April 4, 2020 and September 19, 2020, the State of Arizona was a signatory to the Uniform Child Custody and Jurisdiction Enforcement Act ("UCCJEA").

231.   Per the terms of said Act, which is effective in 49 states, Family Courts and law enforcement agencies are required to enforce custody orders.

232.   Defendant City of Mesa for at least the past five years, has chosen deliberately to ignore its obligations to enforce custody orders pursuant to the Act.  In simple terms, when a parent refuses to exchange a minor child, per the terms of a child custody order, the Mesa Police Department refuses to intervene in the absence of visible and obvious physical harm to the child.

233.   Moreover, that refusal includes a stated policy wherein even if a Maricopa County Superior Court Judge specifically orders officers to remove the child, officers will refuse the court order.

234.   Additionally, the Maricopa County Superior Court honors the policies of Mesa by and through its judges who refuse to execute additional orders to enforce custody rights when one parent refuses to make an exchange.

235.   Thus, any parent residing in Mesa can refuse to exchange a child with total impunity.

236.   Said policy and its implementation violate the UCCJEA as codified in A.R.S. §25-1001 et seq. Further, they violate 42 U.S.C. §1997 in that said local enforcement agency officers have engaged in a pattern and practice of conduct that deprives parents with custody rights.

237.   Said conduct further violates the rights of children per the terms of custody orders that remain unenforced.

238.   With respect to Plaintiff, the within Defendants and/or their agents conspired to deprive Plaintiff of his son, McKinley, for four reasons: first, to cover up their involvement in the criminal enterprises; second, to create a pretense for contrived violations of fake Orders of Protection and fake Dissolution of Marriage court orders in order to discredit Plaintiff; third, to carry out an extortion attempt wherein if Plaintiff stopped his investigation into the criminal enterprises, Defendants would ensure custodial time with McKinley; and fourth, to cause Plaintiff to fear for his safety and thereby cause Plaintiff to leave the State - with the added benefit of Plaintiff being unable to appear personally at hearings on the phony violations and charges thereon.

239.   With respect to Defendant Roessler, most of the acts alleged in this cause of action were performed by him to the intended benefit of Dawna and the other Defendant participants in the bribery and racketeering enterprises.  Said acts include: a) taking reports of restraining order violations by Brittany and Dawna that he knew were false while hiding Plaintiff's reports that Brittany and Dawna had violated the February 20, 2020 temporary custody orders on many occasions; b) refusing to enforce child custody order by refusing to return McKinley to Plaintiff; c) harassing Plaintiff by refusing to take reports of Brittany's custody violations and Dawna's custodial interference violations as well as Dawna's breach of her responsibility to her court appointed role as Custodial Facilitator and refusing to perform welfare checks on Brittany and McKinley; and d) mischaracterizing in official police reports text messages Plaintiff allegedly sent to Dawna regarding her refusal and Brittany's refusal to return McKinley as Plaintiff "harassing" Dawna in violation of the restraining orders when he knew the texts pertained to the kidnapping of McKinley and violation of the custody order; and e) falsely

arresting Plaintiff on October 11, 2020 after conspiring with Dawna to send messages to her phone from a cloned cell phone—thus giving the appearance that Plaintiff has sent the messages.

240.   Plaintiff is informed and believes that Defendant Roessler had been a participant in the criminal enterprises by providing cover and misdirection from police investigations and that he fabricated evidence or destroyed evidence to prevent discovery of the enterprises and Brittany and Dawna's participation in them.

241.   As to the Mesa City Attorney's office, they failed and refused to prosecute Dawna with felony interference with child custody.

242.   Said actions in allowing Brittany and Dawna to file false police reports alleging phony violations of the restraining orders were intended to deprive Plaintiff of his civil rights including those rights he had as a father and those rights as a parent granted to him by the Court on February 20, 2020.

243.   Thus, Plaintiff is entitled to an award of specific damages at or exceeding $350,000.00 for all losses of income suffered in an amount according to proof at time of trial.

244.   Additionally, the violations alleged herein have caused Plaintiff general damages to his health and wellbeing hypertension, including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

245.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

**THIRD CAUSE OF ACTION**

*(Conspiracy to Violate and Violations of 42 U.S.C. §1983, 18 U.S.C.§241 vs All Defendants)*

246.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 245 of this complaint as if fully set forth hereat.

247.   The within Defendants are subject to 18 U.S.C. §241 which provides that where two or more individuals conspire to threaten or intimidate, injure or oppress another, they are guilty of civil rights violations.

248.   Said statute also provides that where two or more individuals appear at the premises of another for the purposes of threatening or intimidating, injuring, or oppressing, or kidnapping another, they are guilty of criminal civil rights violations.

249.   The acts of all of the Defendants as alleged herein constitute a conspiracy to deprive Plaintiff of his civil rights.

250.   Thus, Plaintiff is entitled to an award of specific damages for all monetary losses suffered, which at this time meet or exceed $350,000.00 in an amount according to proof at time of trial.

251.   Additionally, the violations alleged herein have caused Plaintiff general damages to his health and wellbeing including hypertension, headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

252.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

## FOURTH CAUSE OF ACTION

*(Conspiracy to Violate 42 U.S.C. §1983, 18 U.S.C.§242 vs. Kiffmeyer,*

*Roessler, City of Mesa, County of Maricopa)*

253.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 252 of this complaint as if fully set forth hereat.

254.   These within Defendants are parties subject to the terms of 18 USC §242 which provides in pertinent part that "whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person… to the deprivation of any rights, privileges, or immunities…" is guilty of a criminal act.

255.   The acts set forth in this complaint violate said statute and are criminal.

256.    Thus, Plaintiff is entitled to an award of specific damages for all losses of income suffered in an amount according to proof at time of trial.

257.    Additionally, the violations alleged herein have caused Plaintiff general damages to his health and wellbeing including hypertension, headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

258.    The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

**FIFTH CAUSE OF ACTION**

*(Violations of 42 U.S.C. §14141 vs all Defendants)*

259.    Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 258 of this complaint as if fully set forth hereat.

260.    As set forth hereinabove, said individual Defendants and government entity Defendants have engaged in a pattern and practice of conduct designed to deprive individuals of their rights and privileges protected by the Constitution.

261.    With respect to Plaintiff, as alleged herein, said Defendants intentionally created schemes to deprive him of his rights and his liberties to cover up and conceal racketeering activities as set forth in 18 U.S.C.§1951, 1952, 1956, 1957 and 1958.

262.    Said schemes included falsifying court orders to deprive Plaintiff of his son and to steal his money, hacking into Plaintiff's business computers to damage his law practice and his clients, hacking into his clients' computers to disrupt their businesses, filing phony charges of violating illegally obtained restraining orders to discredit Plaintiff while failing and refusing to enforce court custody orders and refusing to charge Brittany and Dawna for custodial interference.

263.    Said actions caused Plaintiff and his law practice significant financial harm in an amount at or exceeding $250,000.00.

264.    Thus, Plaintiff is entitled to an award of specific damages for all monetary losses suffered, which at this time meet or exceed $250,000.00 in an amount according to proof at time of trial.

265.    Additionally, the violations alleged herein have caused Plaintiff general damages to his health and wellbeing including hypertension, headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

266.    The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

## SIXTH CAUSE OF ACTION

*(Violations of Substantive Due Process Rights v. City of Mesa, County of Maricopa)*

267.    Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 266 of this complaint as if fully set forth hereat.

268.    The actions of these Defendants as set forth in this Complaint were intended to deprive Plaintiff of his due process rights by depriving him of his rights to his child pursuant to the UCCJEA and by depriving him of his rights to adjudicate for his child.

269.    Further, said Defendants violated Plaintiff's rights by failing and refusing to investigate Brittany's criminal conduct including at least two attempts made on Plaintiff's life and her conduct in stealing money from Plaintiff and his law office, including the spoliation of evidence, all to cover up the criminal enterprises.

270.    Plaintiff has suffered monetary damages from these actions. Thus, Plaintiff Thaler is entitled to an award of specific damages for all monetary losses suffered, which at this time meet or exceed $350,000.00 in an amount according to proof at time of trial.

271.    Additionally, the violations alleged herein have caused Plaintiff Thaler general damages to his health and wellbeing including hypertension, headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

272.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Plaintiff's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

### SEVENTH CAUSE OF ACTION

*(Violations of Procedural Due Process Rights v. Maricopa County, City of Mesa)*

273.   Plaintiff realleges Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 272 of this complaint as if fully set forth hereat.

274.   The acts of these Defendants in refusing to investigate Plaintiff's complaints of criminal wrongdoing so that Plaintiff could be compensated for his losses, and specifically, the actions of Marvin L. Davis in allowing his courtroom to be hijacked during the dissolution of marriage litigation with phony orders and a phony divorce decree to cover up the criminal enterprises constitutes a violation of Plaintiff's procedural due process rights.

275.   Plaintiff has suffered monetary damages from these actions. Thus, Plaintiff Thaler is entitled to an award of specific damages for all monetary losses suffered, which at this time meet or exceed $350,000.00 in an amount according to proof at time of trial.

276.   Additionally, the violations alleged herein have caused Plaintiff Thaler general damages to his health and wellbeing including hypertension, headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

277.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

### EIGHTH CAUSE OF ACTION

*(Violations of Equal Protection/Selective Enforcement v. City of Mesa)*

278.   Plaintiff realleges Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 277 of this complaint as if fully set forth hereat.

279.     As set forth above and in addition thereto, the City of Mesa has: a) has failed and refused to act in accordance with the UCCJEA as set forth in state statute by refusing to uphold the Maricopa County Superior Court's February 20, 2020 custody order; b) has failed and refused to accept reports of custodial interference; c) has failed and refused to allow Plaintiff to confirm that his child is safe; d) has failed to file charges against Brittany and Dawna for custodial interference despite overwhelming evidence of the same in order to cover up its policy of rejecting its obligations under the UCCJEA; e) filed charges against Plaintiff for alleged acts that it knows do not violate the terms of "Orders of Protection" while intentionally refusing to charge Defendants Brittany and Dawna; f) proceeded with trials in Plaintiff's absentia when it knew Plaintiff was ill and, by doctors' instructions, could not appear at trial; g) issued warrants and set bail thereafter in amounts that far and away exceed all reasonable sums for the charges alleged in an attempt to falsely imprison Plaintiff (or demanded that no bail be provided) and to prevent Plaintiff from amending and prosecuting the within complaint; h) and has prevented Plaintiff from being represented by counsel of his choosing in violation of Constitutional and statutory authority.

280.     Further, said Defendants violated Plaintiff's rights by failing and refusing to investigate Brittany's criminal conduct including at least two attempts made on Plaintiff's life and her conduct in stealing money from Plaintiff and his law office, including the spoliation of evidence, all to cover up the criminal enterprises.

281.     Plaintiff has suffered monetary damages from these actions. Thus, Plaintiff Thaler is entitled to an award of specific damages for all monetary losses suffered, which at this time meet or exceed $350,000.00 in an amount according to proof at time of trial.

282.     Additionally, the violations alleged herein have caused Plaintiff Thaler general damages to his health and wellbeing including hypertension, headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

283.     The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for

1    Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by

2    statute in an amount to be determined at time of trial.

3                              **NINTH CAUSE OF ACTION**

4              *(Conversion vs. Brittany, Dawna, Cairo, Gadberry, Kiffmeyer,*

5                  *Greg Davis, Christopher Falbo and Nicoletta Falbo)*

6    284.    Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 283 of

7              this complaint as if fully set forth hereat.

8    285.    As alleged herein, in 2015 Plaintiff and Brittany purchased a home in Gilbert, Arizona.

9              Thaler provided $38,400 toward the down payment and then made each and every mortgage

10             payment through November 2019. At the time of making the purchase, Plaintiff and Brittany

11             agreed that they each own the sole rights to the down payments and any and all equity would be

12             divided equally between them.

13   286.    In or about January 2020, Plaintiff and Brittany agreed to sell the residence. But in fact,

14             Brittany had no intention of selling the residence. Instead, she intended to falsify the sale, rent

15             out the property and keep all of the equity and all of the rents for herself. In furtherance of this

16             scheme, she and these Defendants conspired to falsify a sale using falsified and forged

17             documents and thereafter reporting to Plaintiff that the property had been sold and that the

18             proceeds from said sale in the amount of approximately $173,000 were being held by

19             JetClosings Inc. and thereafter transferred to the Berkshire Law Office and then to Attorney

20             Greg Davis.

21   287.    JetClosings, Gadberry and Berkshire on behalf of the Berkshire Law Office and Attorney

22             Davis confirmed that each had received the proceeds of the sale per the purported arrangement.

23             However, neither Berkshire nor Attorney Davis ever received any of the proceeds. And Plaintiff

24             is informed and believes and thereon alleges that JetClosings never received any proceeds

25             because in fact there was no sale.

26

27

28

288.   In truth, Brittany is beneficial owner of the property. Further, Brittany has received and continues to receive rent payments from the illegal owners of the property, Christopher Falbo and Nicoletta Falbo

289.   Moreover, these Defendants conspired to run up attorney's fees and thereafter submit fraudulent billing statements in the dissolution of marriage and to submit to the Court false and fraudulent documents to obtain an order for child support.  Said false documents grossly understated Brittany's income and grossly overstated Plaintiff's income.

290.   As such Defendants and each of them conspired to deprive Plaintiff and did deprive Plaintiff of his down payment monies in the sum of $38,400 and one half of the equity in the property in the sum exceeding $125,000 according to proof at time of trial.

291.   Additionally, Defendants and each of them conspired to deprive Plaintiff of one half of the rent received from Christopher Falbo and Nicoletta Falbo in an amount not yet ascertained but believed to be approximately $10,000.

292.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

### TENTH CAUSE OF ACTION

*(Conspiracy to Defraud v. Brittany, Dawna, Kiffmeyer, Greg R. Davis, Roessler, City of Mesa, Mesa defendants, Tatz, and Lawler)*

293.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 292 of this complaint as if fully set forth hereat.

294.   Defendants and each of them schemed to falsify three court cases for the purposes of damaging Plaintiff which in turn they believed would protect their participation in the racketeering/bribery schemes.

295.   In fact, Defendants falsified a Dissolution of Marriage case and two Orders of Protection cases leading Plaintiff and the public to believe that the cases were legitimate.

296.    Plaintiff believed, as did the general public, that the phony cases were legitimate and that the phony orders allegedly coming from the Courts where the cases were "assigned", were legitimate.

297.    Plaintiff and the public's belief in the legitimacy of the cases was reasonable in that neither Plaintiff nor the public could have known at the relevant times that four judges had participated in such a scheme or why they would participate in such a scheme.

298.    As a result of Plaintiff's reliance on the legitimacy of the cases, Plaintiff was subjected to: phony motions to which he responded, to making motions that would never be granted, and to orders that damaged him personally and financially.  This included stealing from Plaintiff his down payment and equity in the family residence.  And it included allowing for Plaintiff to be charged and convicted for violating Orders of Protection that do not exist.

299.    Had Plaintiff known the three cases were phony, he would not have agreed to the sale of the family residence.  And he would have taken action with motions to legitimate courts to stop all actions by Defendants in the phony cases.

300.    As a direct and proximate result. Plaintiff has been damaged in the sum exceeding $150,000 in an amount according to proof at time of trial.

301.    Additionally, the violations alleged herein have caused Plaintiff general damages to his health and wellbeing including hypertension, headache, stomachache and Post Traumatic Stress in an amount according to proof at time of trial.

302.    The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

## ELEVENTH CAUSE OF ACTION

*(Invasion of Privacy v. Brittany, Dawna,*

*Roessler, Gadberry, Greg R. Davis, City of Mesa, City of Phoenix)*

303.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 302 of this complaint as if fully set forth hereat.

304.   Beginning in February 2015, Brittany began hacking into Plaintiff's computer to determine how much information Plaintiff had concerning Russian organized crime activities in Arizona. During 2011-2012, Plaintiff had obtained information on Russian organized crime in California, specifically on the smuggling of goods through Southern California and on methods used to create fake identities—from hospital records of patients in certain Arizona-based hospital chains. Of the individuals participating in the scheme, Brittany had worked with two of them.

305.   During this hacking, Brittany stole confidential communications between Plaintiff and clients and she stole confidential communications with friends and family.

306.   In February 2016, fearing Plaintiff would figure out that she had created the fake Tarzana Falls judgment to extort money from him, Brittany hacked into Plaintiff's personal and business computers and placed viruses in them to erase information.

307.   In February 2017, Brittany stole a check belonging to Plaintiff's personal bank account, executed it in Plaintiff's name and deposited it into an account she controlled at Wells Fargo Bank in a phony name.

308.   Then on August 14, 2017, Brittany stole another check to Plaintiff's personal account at Chase Bank, this check bearing Plaintiff's previous Phoenix address. She filled out the check complete with signature payable to the City of Phoenix for a water bill in another person's name.

309.   In September 2017, while five months pregnant, Brittany panicked that Plaintiff was discovering the extortion scheme and Plaintiff might discover that in September 2016, she had been pregnant but had a miscarriage.

310.   So Brittany attempted to erase 110,000 files from four separate computers belonging to Plaintiff by hacking into the computers and moving said files into the recycle bins of each so that they would be erased the next time he turned on the computers.

311.    In November 2018, after Plaintiff discovered the massive credit card charges, Dawna and Brittany concocted a scheme to place spyware in Plaintiff's cell phone and in his computers to determine what Plaintiff knew and to obtain any information they could find to extort Plaintiff into that which Plaintiff only understood at the time as being Brittany's bizarre behavior.

312.    Then came stealing Plaintiff's credit and debit cards in early 2019 and those of his law office, erasing files and documents belonging to clients and then poisoning Plaintiff in order to achieve a positive drug test in order to steal McKinley.

313.    With that, Brittany and Dawna stole from Plaintiff's office confidential client files and documents including the files Plaintiff was storing for his first wife, Melinda. The information from these files has since been misused during the dissolution proceedings to try to embarrass and harass Plaintiff. The documents were disseminated to Gadberry and to Greg R. Davis and to Marvin L. Davis who refused to return the same in violation of Arizona statutes.

314.    In September 2020, using the spyware placed on Plaintiff's phone, Dawna and Brittany and Shauna schemed to clone Plaintiff's phone and then send through the cloned phone messages to Dawna and to Brittany; thereafter they would claim that Plaintiff had violated the illegally obtained restraining orders. The purpose in this was to run up fake charges to disrupt Plaintiff and his law practice and to take McKinley without Plaintiff being able to see his son.

315.    This plan was aided and abetted by Roessler who ensured the false reports would be presented to the Mesa City Attorney while reports of Brittany and Dawna interfering with custodial rights was not.

316.    This plan was further aided and abetted by members of the City Attorney's Office refusing to prosecute Dawna and Brittany while prosecuting Plaintiff for charges said Office knew were false and contrived and came from a cloned cell phone.

317.    On October 11, 2020 when the plan was not working as quickly as these Defendants wanted, Roessler, Brittany, Dawna and Shauna concocted a plan to have Plaintiff arrested for sending text messages to Dawna. To that end, they used the cloned phone to send messages

into Dawna's cell phone.  Then Roessler took photos of the fake text messages, and drove to Plaintiff's residence and walked onto his property with the intent of falsely arresting Plaintiff.

318.     Even after Plaintiff denied knowing anything about the text messages, Roessler lied in his arrest report stating falsely that Plaintiff had admitted sending them.

319.     Further, during late October through early November 2020, John Chavez (Brittany's father and Dawna's ex-husband) sent messages to Plaintiff by MSN Messenger telling Plaintiff that if he stopped investigating the above matters, Plaintiff could see his son. Meanwhile, Roessler and other members of the Mesa police contacted Sprint pretending to be Plaintiff trying to get IMEI and other identifying information of Plaintiff's phone so that they could locate Plaintiff.

320.     The aforementioned acts constitute an invasion of Plaintiff's rights and were intended to invade Plaintiff's privacy.

321.     The actions of these Defendants caused Plaintiff to have to sell his residence and leave the State of Arizona to stop the invasion and the illegal acts thereon all to his damage in an amount at or exceeding $100,000.00.

322.     Further, the violations alleged herein have caused Plaintiff general damages to his health and wellbeing including hypertension, headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

323.     The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

### TWELFTH CAUSE OF ACTION

*(Intentional Infliction of Emotional Distress vs. All Defendants)*

324.     Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 323 of this complaint as if fully set forth hereat.

325.     The acts of these Defendants were outrageous.

326.     Said outrageous acts were intended to cause Plaintiff severe emotional distress.

327.   Said acts resulted in severe emotional distress to Plaintiff.

328.   The actions of these Defendants caused Plaintiff to require multiple hospitalization for high blood pressure spikes that were aided by Brittany's poisoning of Plaintiff all to his damage in a sum meeting or exceeding $50,000.00.

329.   Further, the outrageous conduct has caused Plaintiff general damages to his health and wellbeing including hypertension, headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

330.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

## THIRTEENTH CAUSE OF ACTION

*(Interference with Business/Prospective Economic Advantage v. All Defendants)*

331.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 330 of this complaint as if fully set forth hereat.

332.   The actions of Defendants were intended to damage Plaintiff's reputation and his law practice to extort him into stopping his investigation.

333.   And in fact, the acts set forth herein resulted in the loss of more than $75,000 in income and a loss of more than $250,000 in future income.

334.   Further, the outrageous conduct has caused Plaintiff general damages to his health and wellbeing including hypertension, headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

335.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

## FOURTEENTH CAUSE OF ACTION

(Injunctive Relief v. Arizona Department of Child Support Services)

336.   Plaintiff realleges and incorporates herein by reference paragraphs 1 through 371 of this Complaint as if fully set forth hereat.

337.   The Arizona Department of Child Support Services ("DCSS") is a state agency in charge of collecting child support from parents who are ordered to pay such support.

338.   On or about January 25, 2022, DCSS contacted Plaintiff demanding payment in the sum of $26,171 based on a fraudulent and phony support order allegedly executed by Defendant Marvin L. Davis and based on a "Decree" thereon also allegedly executed by Defendant Marvin L. Davis.

339.   In fact, there are no support orders executed by Marvin L. Davis.  Instead, there is one alleged "Order" containing a forged signature of Davis and a phony "Decree" also containing two forged signatures of Davis.  The signatures on the Decree do not match the signature on the alleged Order.

340.   Plaintiff contends that the signatures and the documents on which they appear are fraudulent and phony and thus have no weight or effect whatsoever.

341.   As a result, neither said Order nor said Decree provide a legal basis on which support was ordered or on which support can be collected by DCSS.

342.   Unless enjoined from proceeding, DCSS will cause damage to Plaintiff by obtaining tax refund monies due Plaintiff, reporting the failure to pay the wrongful debt to consumer reporting agencies, and by reporting the alleged failure to pay to the Department of State in order to revoke Plaintiff's passport privileges—thus violating additional civil rights.

343.   Plaintiff seeks a preliminary and permanent injunction that prevents DCSS from taking these actions or any other actions against Plaintiff.

### FIFTEENTH CAUSE OF ACTION

(Declaratory and Injunctive Relief v. Maricopa County Superior Court)

344.   Plaintiff realleges paragraphs 1 through 343 of this Complaint as though fully set forth hereat.

345.   Currently, the Superior Court for Clark County, Nevada, Department G, has before it a Complaint for Annulment from Plaintiff against Brittany. Said Court determined in March 2021 that the proceedings before Defendant Marvin L. Davis were highly irregular and questionable leading to the appearance of fraud.

346.   Since March 2021, Plaintiff has discovered that the entirety of the pleadings and Orders and the Decree were fraudulent.

347.   Under the Uniform Child Custody Jurisdiction and Enforcement Act, the initial Court where filing occurs and where the minor child resides has jurisdiction over the proceedings. However, jurisdiction can be conferred onto the Court of another state when the child has moved or when the protection of the child requires the same.

348.   Under the UCCJEA, the judge of the court attempted to assume jurisdiction contacts the judge of the court which currently has jurisdiction.

349.   Judge Rhonda K. Forsberg, presiding in Department G, attempted on several occasions over the past six months to speak with Judge Davis without success.

350.   Also, in August 2021, Brittany changed her residence and that of McKinley to an unknown location believed to be outside of the State of Arizona.

351.   Plaintiff seeks a Declaration from this Court that the proceedings in Maricopa County Superior Court are null and void and that preliminary and permanent injunction shall issue preventing Maricopa County and its Superior Court from taking any action to enforce Orders entered after April 2020 when Defendant Marvin L. Davis began presiding over FC2019-098211.

352.   Further, Plaintiff seeks a Declaration that the Order of Protection under case number FC2019-098471 was and is a fraud and therefore unenforceable. And to that end, Plaintiff seeks a preliminary and permanent injunction against the enforcement of said fraudulent Order and an injunction against prosecution of any alleged violations of said Order.

353.     Finally, Plaintiff seeks an Order from this Court permitting Judge Rhonda K. Forsberg and Clark County, Nevada to assume all jurisdiction over all matters in dissolution or annulment between Plaintiff and Brittany.

## SIXTEENTH CAUSE OF ACTION

(Declaratory Relief/Injunctive Relief v. Brittany Rae Chavez, County of Maricopa)

354.     Plaintiff realleges paragraphs 1 through 353 of this Complaint as though fully set forth hereat.

355.     Plaintiff seeks a Declaration from this Court that the Order of Protection obtained by Dawna Rae Chavez under case number 2020-000468 is null and void.

356.     Further, Plaintiff seeks a preliminary and permanent injunction against the enforcement of warrants or charges emanating from said Order of Protection.

## SEVENTEENTH CAUSE OF ACTION

Quiet Title v. Christopher Falbo, Nicolette Falbo and Brittany Thaler)

357.     Plaintiff realleges paragraphs 1 through 356 of this Complaint as though fully set forth hereat.

358.     Based on the facts set forth herein, a dispute has arisen as to the true ownership of property located at 4929 South Joshua Tree Lane, Gilbert, Arizona 85298 and whether said property was sold pursuant to stipulation and order of the Maricopa County Superior Court, Plaintiff having received no consideration for said alleged sale.

359.     Plaintiff seeks a determination and thereafter a declaration and Order from this Court pursuant to Arizona Revised Statute section 12-1101 as to who owns said property.

## EIGHTTEENTH CAUSE OF ACTION

(Accounting v. Greg R. Davis, Kiffmeyer, Gadberry)

360.     Plaintiff realleges and incorporated herein by reference paragraphs 1 through 359 of this Complaint as if fully set forth hereat.

361.     On or about April 29, 2020, Plaintiff and Brittany's residence allegedly was sold with the net proceeds from the sale held by JetClosings.  However, in or about July 2020, monies held

by JetClosings disappeared with several Defendants providing conflicting accounts as to where the money went and to whom.

362.   Despite multiple written requests, Defendant Greg R. Davis has refuses and still refuses to provide to Plaintiff an accounting of monies allegedly received by him and his office related to the sale of Plaintiff and Brittany's residence in Gilbert, Arizona. Further, Davis has failed to disclose whether the funds received came from either Defendant Gadberry or from Defendant JetClosings.

363.   Defendant Davis had no authority to receive any monies from the sale of the Gilbert residence.

364.   As to Kiffmeyer, she has refused multiple written requests to account for monies received by her from Brittany and Dawna or from Defendant Jet Closings.

365.   Moreover, Kiffmeyer has failed to confirm whether the monies she received came from JetClosings or from Defendant Gadberry or from Defendant Greg R. Davis.

366.   Without an accounting, Plaintiff has no way of knowing where monies from the sale, portions of which belong to him, were provided and by whom thus preventing their recovery.

367.   Therefore, Plaintiff seeks an accounting of said monies.

### NINETEENTH CAUSE OF ACTION

#### (Breach of Fiduciary Duty v. Brittany)

368.   Plaintiff realleges and incorporated herein by reference paragraphs 1 through 367 of this Complaint as if fully set forth hereat.

369.   As the spouse of Plaintiff, Brittany owed a fiduciary duty to Plaintiff during the time of the parties' marital separation to preserve and protect all community property assets including Plaintiff's share of said assets.

370.   Brittany failed to protect Plaintiff's portion of the assets and instead, she intentionally transferred said assets to others for the specific purposes of preventing Plaintiff from obtaining them.

371.   Further, Brittany damaged and disrupted Plaintiff's law office by stealing files and by hacking into and then disrupting Plaintiff's law office computer system.

372.   Brittany's actions breached her statutory and common law fiduciary duties owed to Plaintiff.

373.   As a direct and proximate result of Brittany's actions, Plaintiff has been damaged in an amount according to proof at time of trial exceeding $350,000.00.

374.   As Brittany's actions were intentional and were intended to cause severe financial harm, Plaintiff is entitled to an award of punitive and exemplary damages in an amount to be determined at time of trial.

**WHEREFORE**, Plaintiff prays for damages as follows:

## FIRST CAUSE OF ACTION

1. For specific damages according to proof at time of trial;

2. For general damages according to proof at time of trial;

3. For punitive and exemplary damages in an amount to be determined at time of trial;

## SECOND CAUSE OF ACTION

4. For specific damages according to proof at time of trial;

5. For general damages according to proof at time of trial;

6. For punitive and exemplary damages in an amount to be determined at time of trial;

7. For a preliminary and permanent injunction requiring Defendants to comply with the UCCJEA;

## THIRD CAUSE OF ACTION

5. For specific damages according to proof at time of trial;

6. For general damages according to proof at time of trial;

7. For punitive and exemplary damages in an amount to be determined at time of trial;

## FOURTH CAUSE OF ACTION

8. For specific damages according to proof at time of trial;

9. For general damages according to proof at time of trial;

10. For punitive and exemplary damages in an amount to be determined at time of trial;

//

### FIFTH CAUSE OF ACTION

11. For specific damages according to proof at time of trial;

12. For general damages according to proof at time of trial;

13. For punitive and exemplary damages in an amount to be determined at time of trial;

### SIXTH CAUSE OF ACTION

14. For specific damages according to proof at time of trial;

15. For general damages according to proof at time of trial;

16. For punitive and exemplary damages in an amount to be determined at time of trial;

### SEVENTH CAUSE OF ACTION

17. For specific damages according to proof at time of trial;

18. For general damages according to proof at time of trial;

19. For punitive and exemplary damages in an amount to be determined at time of trial;

### EIGHTH CAUSE OF ACTION

20. For specific damages according to proof at time of trial;

21. For general damages according to proof at time of trial;

22. For punitive and exemplary damages in an amount to be determined at time of trial;

### NINTH CAUSE OF ACTION

23. For specific damages according to proof at time of trial;

24. For general damages according to proof at time of trial;

25. For punitive and exemplary damages in an amount to be determined at time of trial;

### TENTH CAUSE OF ACTION

26. For specific damages according to proof at time of trial;

27. For general damages according to proof at time of trial;

28. For punitive and exemplary damages in an amount to be determined at time of trial;

### ELEVENTH CAUSE OF ACTION

29. For specific damages according to proof at time of trial;

30. For general damages according to proof at time of trial;

31. For punitive and exemplary damages in an amount to be determined at time of trial

## TWELFTH CAUSE OF ACTION

32. For specific damages according to proof at time of trial;

33. For general damages according to proof at time of trial;

34. For punitive and exemplary damages in an amount to be determined at time of trial;

## THIRTEENTH CAUSE OF ACTION

35. For specific damages according to proof at time of trial;

36. For general damages according to proof at time of trial;

37. For punitive and exemplary damages in an amount to be determined at time of trial;

## FOURTEENTH CAUSE OF ACTION

38. For Preliminary and Permanent Injunction.

## FIFTEENTH CAUSE OF ACTION

39. For Declaratory Relief;

40. For Preliminary and Permanent Injunction.

## SIXTEENTH CAUSE OF ACTION

41. For Declaratory Relief;

42. For Preliminary and Permanent Injunction.

## SEVENTEENTH CAUSE OF ACTION

43. For a determination of ownership rights in real property.

## EIGHTTEENTH CAUSE OF ACTION

44. For an accounting.

## NINETEENTH CAUSE OF ACTION

45. For specific damages according to proof at time of trial;

46. For general damages according to proof at time of trial;

47. For punitive and exemplary damages in an amount to be determined at time of trial;

1

## ALL CAUSES OF ACTION

2    48. For costs of suit incurred herein;

3    49. For reasonable attorney's fees;

4    50. For prejudgment interest at the legal rate;

5    51. For all other relief this Court deems just and proper.

6    Date: May 2, 2022                                    HARRIS/THALER LAW

7

8

9    By:_____

10   JOHN I. THALER, Plaintiff

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28